S. PETER LEBOWITZ AND THERESA LEBOWITZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lebowitz v. Commissioner
Docket No. 27543-82.
United States Tax Court
T.C. Memo 1989-178; 1989 Tax Ct. Memo LEXIS 181; 57 T.C.M. (CCH) 179; T.C.M. (RIA) 89178; April 19, 1989; As corrected April 24, 1989 *181 Ps were limited partners in F, a limited partnership formed in 1976 to mine coal in West Virginia. F subleased coal mining property from C and paid an advance royalty consisting of cash and a nonrecourse promissory note. Held:
(1) The partnership was engaged in a business with the actual and honest objective of making a profit. (2) The nonrecourse promissory note does not represent genuine indebtedness. (3) Ps are not liable for additional interest under section 6621(c). Thomas S. Carles, for the petitioners. Richard F. Flaherty, Alan G. Merkin, and Ismael Gonzalez for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: This case was assigned to Special Trial Judge Hu S. Vandervort pursuant to section 7456(d)(4) of the Code (redesignated section 7443A(b)(4) by section 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755) and Rule 180 et seq. of the Tax Court Rules of Practice and Procedure.[1] *182 The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE VANDERVORT, Special Trial Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: [2]
Year
Deficiency
1976
$ 39,325.00
1977
2,192.00
The deficiencies resulted from losses claimed by petitioners as limited partners of Fenwick Associates, Ltd., an accrual method limited partnership organized to mine and sell coal. Fenwick subleased land in Nicholas County, West Virginia and agreed to pay an advance royalty. The issues for decision are: A. Whether the mining venture lacked economic substance and should be disregarded for tax purposes; and B. If the venture is not to be totally disregarded, whether a nonrecourse note given by the partnership is genuine indebtedness to support the deductions claimed; C. Whether petitioners are liable for additional interest under section 6621(c) for substantial *183 underpayments attributable to a tax-motivated transaction. FINDINGS OF FACT Some of the facts have been stipulated and are so found. This reference incorporates the stipulation of facts and attached exhibits. Petitioners resided in Scarsdale, New York, when they filed their petition. They timely filed joint Federal income tax returns on a cash basis for their 1976 and 1977 taxable years. Hewitt Tract
Clair and Ellen Hewitt held property in Nicholas County, West Virginia (Hewitt tract), which contains Sewell coal, a premium coal. Sewell coal is valued because it is well-suited to make coke and steel, and its low ash and sulphur content meet air pollution regulations for utility power plants. Typically, the thickness or height of coal in a seam is consistent. Sewell coal, however, is erratic and may vary drastically within a particular seam. This makes the seam difficult to mine because equipment can easily extract coal at one point and then quickly run into an area too thin to be mined. In 1973, the coal industry began to prosper when oil prices rose and government policies were initiated to develop independent domestic energy resources. After his election, President Carter also *184 encouraged coal companies to increase production to secure energy independence. From 1973 to 1975, the price of coal more than doubled. In 1976, Sewell coal sold for $ 45.00 to $ 55.00 a ton and occasionally sold for $ 100.00 a ton on the spot market. During this time, other types of coal sold for $ 30.00 to $ 40.00 a ton. The Hewitts, in October 1969, leased the coal rights on the Hewitt tract to the Island Creek Coal Company (Island Creek). On October 5, 1974, the Hewitts conveyed the tract to the Westvaco Corporation. The Hewitts retained the coal rights to the tract, subject to the lease to Island Creek, and the right of way to remove the coal. Clair Hewitt, however, soon wanted to reacquire the coal rights from Island Creek. In December 1974, Clair and Ellen Hewitt gave Frank and Ernestine Harris a 30-percent interest in the coal rights to the Hewitt tract. In return, Frank Harris agreed to pay $ 9,800 and to renegotiate the lease with Island Creek in an effort to have it cancelled. At the same time, Island Creek decided to vacate the Sewell seam on the Hewitt tract. Consequently, Island Creek assigned the coal lease in January 1975 to Laurel Corporation for $ 19,600. The *185 Hewitts and the Harrises owned the Laurel Corporation. In October 1976, Laurel Corporation released its interest in the deep mining coal rights on the Hewitt tract to Clair and Ellen Hewitt and Frank and Ernestine Harris. Thus, on October 26, 1976, Laurel Corporation held the rights to strip mine coal on the Hewitt tract, while its shareholders, the Hewitts and the Harrisses, personally held the deep mining coal rights. The Organization of Coats Run and Fenwick
Leonard Glass and Brooks Bohannon incorporated Rabbit Run Energy Co., Inc. (Rabbit Run) in West Virginia. On August 6, 1976, the Harrisses and Hewitts leased the deep-mining coal rights on 114 acres in the northeast corner of the Hewitt tract to Rabbit Run. Rabbit Run subsequently subleased the coal rights to the 114 acres to Chiver Associates, a limited partnership, on August 31, 1976. Mr. Bohannon and Mr. Glass also formed Coats Run Energy, Inc. (Coats Run) in 1976. On October 26, 1976, the Hewitts and Harrises leased the rights to deep mine coal on the Hewitt tract to Coats Run. On the same day, Laurel Corporation subleased the rights to strip mine coal on the 1,886 acres of the Hewitt tract to Coats Run. In October *186 1976, Coats Run hired Taner Coal Company to mine, using deep mining methods only, the mineable coal on the Hewitt tract. Coats Run also hired J & D Construction Company to mine, using strip mining methods only, the mineable coal on the Hewitt tract. Each of the contract miners agreed to mine coal from the Hewitt tract at a cost of $ 20.00 per ton. Sublease Agreement
On October 26, 1976, Fenwick Associates, Ltd. (Fenwick) and Coats Run signed a Sublease Agreement for cash and a nonrecourse note totalling $ 5,350,000. Fenwick acquired the rights to strip mine and deep mine coal on the Hewitt tract, including the contracts with Taner Coal Company and J & D Construction Company. In return, Fenwick agreed that, before the end of 1976, it would pay cash to Coats Run and execute a nonrecourse promissory note. The Sublease Agreement specified that Fenwick would pay a royalty to Coats Run to mine the coal. The royalty was based on the tons of coal mined. In addition, Fenwick agreed to pay both cash and a nonrecourse promissory note as an advance royalty to Coats Run. An advance royalty is a prepayment which is applied to the royalty obligation as coal is mined. The Sublease Agreement required *187 the following: (1) Fenwick would pay Coats Run a royalty of $ 4.00 per ton of clean coal mined, (2) An advance minimum royalty of the above stated royalty would be paid as follows: (a) $ 1,200,000 cash payment to be made on or before December 12, 1976; and, (b) $ 4,150,000 nonrecourse note due and payable on or before December 31, 1988 at 6% interest. Payment of interest and principal on the $ 4,150,000 nonrecourse note (the Note) was to commence on November 1, 1977, in equal installments of $ 22,000, payable on the first day of each month, until fully paid. Fenwick was to pay the interest and principal payments from the sale of coal mined at a rate of $ 4.00 per ton for the first 1,337,500 tons. Fenwick was to pay an additional $ 1.00 per ton for all coal mined and sold in excess of 342,857 tons. In addition, the Sublease Agreement required a minimum royalty payment, starting in 1977, of $ 100,000 per year. A minimum royalty guarantees payment to the lessor in the event a nominal amount of coal is mined. It was acknowledged that the $ 4.00 per ton payment would be applied to reduce the minimum royalty requirement. If Fenwick was not able to meet the required payments on the Note *188 for greater than 36 months, Coats Run could foreclose on the rights given to Fenwick in the Sublease Agreement. The Sublease Agreement stated that: Fenwick shall promptly file applications and take all necessary steps to obtain all appropriate permits to conduct its strip and deep mining activities. Furthermore, Fenwick agrees that it shall commence mining operations on the subject property no later than August 1, 1977. Along with the Sublease Agreement, Fenwick and Coats Run signed an Agreement of Sublease on October 26, 1976. This agreement provided that Fenwick should take immediate steps to sell the limited partnership interests and pay the $ 5,350,000 advance royalty by December 31, 1976. The Agreement of Sublease stated: In the event Fenwick is unable to obtain the sale of limited partnership interests in the aggregate sum of $ 1,500,000, or in the event Fenwick does not pay to Coats Run the sum of $ 5,350,000 in the manner provided for herein prior to December 31, 1976, then and in that event the sub-lease annexed and this agreement shall be cancelled and deemed null and void, but the General Partner of Fenwick shall be obligated to pay to Coats Run the sum of $ 25,000 as *189 liquidated damages. In return, Coats Run agreed that it would not negotiate with any other partnership, corporation, or entity in connection with the tract until December 31, 1976. The Sublease Agreement also had a liquidated damages paragraph which stated: In the event Fenwick is unable to obtain the sale of the limited partnership interests in the aggregate sum of $ 1,500,000, or in the event Fenwick does not pay to Coats Run the sum of $ 5,350,000 in the manner provided for herein prior to December 31, 1976, then and in that event the sublease annexed and this agreement shall be cancelled and deemed null and void, but the General Partner of Fenwick shall be obligated to pay to Coats Run the sum of $ 25,000 as liquidated damages. On October 26, 1976, Fenwick granted Coats Run the exclusive right to sell the coal mined on the Hewitt tract. On December 16, 1976, Sewell Coal Company, a wholly owned subsidiary of Pittston Corporation, agreed to purchase the Sewell coal mined on the Hewitt tract from Coats Run. On December 16, 1976, A. Raymond Bessette, the general partner of Fenwick, issued a nonrecourse, negotiable promissory note in the amount of $ 4,150,000, together with interest *190 at a rate of 6 percent, with principal and interest payable on or before December 31, 1988 to Coats Run. In addition, Fenwick tendered $ 1,200,000 in cash to Coats Run. The Note and cash were delivered subject to the Sublease Agreement which the parties signed on October 26, 1976. Offering Memorandum
An Offering Memorandum, dated October 26, 1976, was distributed to potential investors. The Offering Memorandum was the only promotional material which Fenwick used to solicit investments. It described Fenwick's planned business operation and the risks inherent in the partnership's proposed business operations. At the outset, it represented that: This investment involves a high degree of risk * * * and, consequently, the purchase of units should be considered only by persons who can afford a total loss of their investment. * * * This investment is available only to those investors whose net worth is at least four times their investment, and some portion of whose annual gross income would be subject to Federal income tax at a rate of 50% or higher. * * * The estimates and illustrations contained in this offering memorandum are subject to assumptions and hypotheses which are believed *191 to be reasonable but which are subject to substantial risks and contingencies which may cause them to be modified substantially. Therefore, no assurance is given that any of the potential benefits described in this offering memorandum will prove to be available. The Offering Memorandum gives a cursory review of the coal mining industry, the contracts for the Fenwick project, and the risk of investment. While there was scant treatment of the economics of the project, heavy emphasis was placed on the potential tax opportunities. The Offering Memorandum includes a 38 page tax opinion prepared by a law firm which details the tax consequences of the investment. The supplement to the Offering Memorandum dealt exclusively with the tax treatment of the advance royalties. The Offering Memorandum contains no data substantiating the income forecasts. There is nothing to describe the status of the promoter's readiness and ability to begin coal mining. There is nothing to indicate the experience and knowledge that the general partner and promoters have in the coal mining industry. The Fenwick promoters hired Keith Casteel to prepare a mining plan (the Casteel report) for the Hewitt Tract and *192 included it in the Offering Memorandum. The Casteel report indicated that there were approximately 1,795,000 tons of recoverable Sewell coal on the Hewitt tract. The Casteel report used an average seam height of 30 inches, and a 60 percent recovery rate. The recovery rate is the percentage of coal which can be extracted from a mine while still leaving sufficient coal to support the roof. Of the 1,886 acres on the tract, Mr. Casteel estimated that only 686 were mineable. Using these figures, he reached his estimate of the recoverable coal on the Hewitt tract. Fenwick filed a Certificate Amending Certificate of Limited Partnership of Fenwick Associates (Certificate) on December 31, 1976. The original Certificate of Limited Partnership was filed on October 28, 1976, listing one general partner and one limited partner. The document provided that any "interests not owned by the General Partner or Limited Partner will be subscribed by additional Limited Partners who will contribute an additional $ 1,475,000. An amending Certificate of Limited Partnership will be filed when all of said subscriptions have been received." The Certificate named A. Raymond Bessette as general partner and *193 identified 39 limited partners, including S. Peter Lebowitz who purchased a 1.65 percent share in Fenwick. Post-1976 Events
After Fenwick acquired the coal rights to the Hewitt tract, the partnership and its agents began to secure the government permits necessary to open the mine. In February 1977, the West Virginia Division of Reclamation issued a prospecting permit to Coats Run for the Hewitt tract. During the period from January 1977 through January 1981, Coats Run spent in excess of $ 433,000 to develop the mine and the road to the mine. Payments were made to rent a bulldozer and other equipment, pay equipment operators, drill core holes, obtain government permits and bonds, purchase stone to pave the road, and pay surveyor fees. In addition, Coats Run spent over $ 360,000 for a mining machine and over $ 110,000 for other mining equipment. Coats Run then hired Westtex Management, Inc. to develop the mine site. In 1976 there was only one road on the property, which was inadequate for mining operations. Westtex Management built a new one mile road to the site where the mining operation was to begin. In addition to building a road on the Hewitt tract, Westtex prepared the mine *194 site, acquired mining permits, met with representatives of the West Virginia Department of Natural Resources, and had a contract to supervise the mine once it was in place and operating. The road to the mine site was built up the side of Fenwick Mountain through a forest, and required the use of dynamite to remove solid rock. Additional blasting was necessary to build the drainage system and culverts. Problems arose in building the road. Westvaco Corp., which owned the adjoining property, refused to allow access to the Fenwick property and demanded a $ 1.50 per ton fee to cross 200 feet of their property. In addition, water studies had to be conducted to comply with the requirements of the Department of Natural Resources. At the beginning of 1977, the road was completed and the site was prepared to be mined. At that time, the West Virginia Department of Natural Resources issued a regulation which required that samplings of a nearby stream be made over a twelve month period before mining operations could begin. The Department of Natural Resources regulation requiring such water samples was not issued until immediately after the Fenwick road was completed and the mine site was prepared. *195 This delayed the mine opening until after 1977. In June 1977, the Mining Enforcement and Safety Administration of the U.S. Department of the Interior notified Coats Run that part of its mining plans did not meet Federal standards. Coats Run obtained a Certificate of Approval for Mine Opening from the West Virginia Department of Mines on June 17, 1977, for the Hewitt tract. On January 6, 1978, Coats Run posted a $ 63,000 bond which the State of West Virginia required. The bond covered estimated costs to reclaim the mine. Coats Run also obtained a prospecting permit from the State of West Virginia on behalf of Fenwick. In June 1978, the West Virginia Department of Natural Resources issued a Mine Drainage Water Pollution Control Permit for the Taner mine, allowing it to discharge water into Big Laurel Creek. In 1978, a wildcat coal miners strike swept West Virginia and led to a national coal strike. Because of the two strikes, truck drivers would not go on the road to mine sites. Bad weather also delayed road construction to the site. In the spring of 1978, both the steel industry and the automobile industry were in a recession due to high interest rates. In July 1979, the United *196 States Environmental Protection Agency issued a permit to Coats Run authorizing it to drain water from the mine into Big Laurel Creek. When Fenwick invested in the Hewitt tract, a substantial portion of the Sewell coal produced was exported to Japan for use in its steel mills. The Japanese, however, developed technology that uses cheap, low-grade coal from South Africa and Australia to manufacture high-grade carbon steel. As a result, the Japanese market was lost, which further hurt the price of Sewell coal. As the price of coal rose, producers had increased output which led to an oversupply. The resulting coal glut and easing energy crisis eventually forced a sharp decline in prices. During the slump in coal prices, companies sold their existing inventories and stopped mining coal to save for future price increases. Eventually, the Sewell Coal Company refused to purchase coal under the contract for $ 28.00 a ton. When Fenwick was organized, the principals of Coats Run and Fenwick made plans to build a coal washing facility and a railroad siding on the Hewitt tract. They were to be located along the Baltimore and Ohio Railroad line, which ran along the eastern edge of the Hewitt *197 tract. Having a processing plant on the Hewitt tract would save Fenwick money since coal could be easily transported on a conveyor belt from the mouth of the Fenwick mine to the processing plant. Rebel Industries, Inc. was incorporated on July 18, 1978, as a West Virginia corporation and was to own the proposed washing plant. It was agreed that Fenwick would receive a preferred rate to have its coal processed. A detailed proposal to construct and operate Rebel's proposed preparation plant was prepared. This proposal contained the necessary details to build the facility. The principals of Rebel Industries researched the costs to construct and operate the facility. Plans to construct the plant, however, were abandoned due to the decline in the coal market. On August 1, 1979, Alla Ohio Valley Coals, Inc. (Alla Ohio) purchased 55 percent of the common stock of Coats Run. On September 11, 1979, Fenwick and Alla Ohio signed an agreement providing that Alla Ohio would perform strip mining operations on the Hewitt tract. In late 1979, Alla Ohio began strip mining operations on the Hewitt tract. The strip mining was done at the outcrop point, where the Sewell seam emerges from the side *198 of Fenwick Mountain. From June 1980 to July 1982, at least 41,593 tons of coal were strip mined from the Hewitt tract. Alla Ohio failed to make full payment of the royalty payments due Fenwick for the strip mining done on the Hewitt tract. Alla Ohio subsequently filed for bankruptcy in the District of Columbia in 1981, and Fenwick filed a claim for $ 150,000. At this time, both Coats Run and Fenwick were in default to each other. Alla Ohio had acquired Coats Run, but had failed to provide the required mining assistance to Fenwick. Fenwick was obligated to make minimum payments on the note, but failed to do so because there was no mining. On April 4, 1983, Coats Run, Fenwick, the Hewitts, and the Harrises signed a Moratorium Agreement which provided that the parties hold in abeyance for a period of five years, subject to a three year extension, the agreement between Coats Run and Fenwick. The Moratorium Agreement also provided that the amounts which would otherwise be paid to Fenwick were instead to be paid directly to Coats Run as payments on the nonrecourse loan owed to Coats Run. Income Tax Returns
Fenwick deducted $ 5,350,000 in 1976 for the accrual of advance royalties. In *199 addition to the advance royalty deduction, Fenwick also deducted a $ 41,500 interest expense, organization expenses of $ 1,972, legal expenses of $ 10,000 and general administration expenses of $ 750. Fenwick deferred organization expenses of $ 57,184. In 1977, Fenwick deducted $ 249,000 for interest, $ 3,750 in professional fees, $ 355 in travel expenses, $ 943 in advertising expenses, $ 278 in miscellaneous expenses, and $ 11,830 to amortize its organization expenses. Respondent disallowed petitioners' share of these deductions in their entirety. In addition, respondent determined that petitioners were liable for additional interest under section 6621(c). OPINION Fenwick was organized to mine and sell coal in West Virginia. It subleased the Hewitt tract from Coats Run and agreed to pay an advance royalty which included a nonrecourse note. It is the opinion of this Court that: A. Fenwick was engaged in a business with the actual and honest objective of making a profit. B. The nonrecourse promissory note does not support the deductions claimed. C. Petitioners are not liable for additional interest under section 6621(c). A. PROFIT OBJECTIVE The initial issue for decision is whether *200 the petitioners are entitled to deduct their portion of Fenwick's claimed deductions for the advance royalty, management and professional fees, and operating expenses. Respondent does not dispute that royalties are considered similar to rent and may be deducted as a trade or business expense under section 162(a)(3). Commissioner v. Jamison Coal & Coke Co.,67 F.2d 342 (3d Cir. 1933), affg. in part and revg. in part 24 B.T.A. 554 (1931); Burnet v. Hutchinson Coal Co.,64 F.2d 275 (4th Cir. 1933), affg. 24 B.T.A. 973 (1931); Seaman v. Commissioner,84 T.C. 564 (1985). Respondent further agrees that fees and operating expenses are normally ordinary and necessary business expenses which may be deducted under section 162. Thomas v. Commissioner,84 T.C. 1244 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Seaman v. Commissioner, supra at 564; Cagle v. Commissioner,63 T.C. 86 (1974), affd. 539 F.2d 409 (5th Cir. 1976). Rather, respondent argues that petitioners are not entitled to the claimed deductions because Fenwick was not engaged in the mining and selling of coal for profit. Respondent asserts that tax motives rather than trade, business, or profit purposes were predominant. We *201 disagree. The test to determine if an activity is a trade or business or was undertaken and carried on for the production of income so that expenses may be deducted is whether the primary purpose and intention in engaging in the activity is to make a profit. Surloff v. Commissioner,81 T.C. 210, 233 (1983); Golanty v. Commissioner,72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). As used in this context, "primary" means "of first importance" or "principally." Surloff v. Commissioner, supra at 233. "Profit" means economic profit, independent of tax savings. Shapiro v. Commissioner,40 T.C. 34 (1963). While a reasonable expectation of profit is not required, a taxpayer must have an actual and honest profit objective. Estate of Baron v. Commissioner,83 T.C. 542, 553 (1984), affd. 798 F.2d 65 (2d Cir. 1986); Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner,734 F.2d 9 (3d Cir. 1984); *202 Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983). A transaction that is structured solely for favorable tax consequences, having no commercial, legal, or profit objective is not given effect for Federal income tax purposes. Frank Lyon Co. v. United States,435 U.S. 561 (1978); Ferrell v. Commissioner,90 T.C. 1154, 1199 (1988). It is the economic substance of a transaction that controls for Federal tax purposes. Gregory v. Helvering,293 U.S. 465, 469 (1935); Golsen v. Commissioner,54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). Petitioners have the burden to prove that the partnership engaged in coal mining with the objective to realize a profit. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). All relevant facts and circumstances are taken into account giving greater weight to objective facts than to mere statements of intent. Taube v. Commissioner,88 T.C. 464, 480 (1987); Jasionowski v. Commissioner,66 T.C. 312 (1976). Profit objective is determined at the partnership level. Taube v. Commissioner, supra at 478; Fuchs v. Commissioner,83 T.C. 79, 98 (1984); *203 Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). The inquiry focuses on the intent of the general partner and the promoters who actually controlled the partnership's activities. Taube v. Commissioner, supra at 480. The profit objective analysis focuses at the beginning of the transaction and is not based on objective hindsight. Smith v. Commissioner,78 T.C. 350, 392 n.32 (1982), affd. without published opinion 820 F.2d 1220 (4th Cir. 1987). Accordingly, we must decide whether the partnership possessed the requisite profit objective based on the facts and circumstances that existed during the latter part of 1976. To determine whether an activity is engaged in for profit, regulations promulgated under section 183 list factors to be analyzed. See section 1.183-2(b), Income Tax Regs.[3] *204 The regulations, however, clearly provide that it is only intended to be a partial list of relevant factors and that no single factor is considered determinative. Section 1.183-2(b), Income Tax Regs.; Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). For the reasons that follow, we conclude that, even though coal was never mined on the tract, Fenwick had an actual and honest objective of making a profit from mining and selling coal. There is no doubt that Fenwick acquired the tract of land to mine coal and made a substantial effort to prepare for operations. Fenwick purchased mining equipment and hired a contractor. The contractor constructed a road to the mine site and prepared the site for operations. Further, Fenwick obtained or attempted to obtain the mining permits and attempted to satisfy the environmental safeguards necessary to begin *205 operations. While Fenwick did not mine coal from the tract, there were external forces in play. The coal industry began to decay after Fenwick acquired the tract due to a worsening economy as well as foreign competition that was deteriorating the domestic market. In addition, there was a miners strike which disrupted operations. Respondent and petitioners produced evidence to value the Hewitt tract. Petitioners' evidence consisted of the Casteel engineering report which was included in the Fenwick Offering Memorandum, the expert testimony of Steven Breeding, and the expert testimony of I. C. Spotte. Further, James Suffridge and Casey Sears, who are currently mining coal on the Hewitt tract, testified for petitioners. Although the Casteel engineering report was offered by petitioners and received into evidence by the Court, Mr. Casteel did not testify at trial. Respondent relied on the testimony and expert report (Joyce Report) of Vincent Joyce and Michael Jaron. While all the experts were duly qualified, Mr. Spotte's testimony was particularly valuable. Mr. Spotte has spent more than 40 years in the coal industry. His positions have ranged from surveyor/helper to president and *206 chairman of Pittston Coal Company, Coal Group, the fifth largest coal company in the United States. At one time, Pittston produced more than one million tons per year of Sewell coal. Mr. Spotte estimated that the average Sewell coal seam height in that part of Nicholas County, West Virginia, is about 36 inches. He stated that small mines were showing a profit mining 26-inch to 29-inch Sewell coal, and that it was more profitable to mine this coal in 1976 when prices were better. Mr. Spotte based his estimate on observing the Hewitt tract and working in the area. He stated that the cost of mining Sewell coal on the Hewitt tract in 1976 was $ 10 to $ 12 a ton. This was at a time when Sewell coal was selling for $ 45 to $ 55 a ton. He estimated that drilling a core hole cost between $ 12,000 and $ 15,000, depending on the depth and location of the hole. He also stated that in the Sewell seam, core drill holes cannot be depended on to determine reserves because Sewell coal is erratic in nature. He further stated that, based on his experience in the coal industry, he would not drill core holes every 500 feet as the Joyce report had recommended. He also testified that, although extensive *207 feasibility studies are normally conducted in a large mining operation, smaller operations normally do not require an extensive feasibility study. It is common for smaller mining companies familiar with the area to begin mining Sewell coal after analyzing the height of the coal at an outcrop or other known data points. Mr. Casteel estimated in the Offering Memorandum that there were 1.795 million recoverable tons of Sewell coal on the Hewitt tract. Mr. Breeding estimated that there were 4.5 million recoverable tons, and Mr. Spotte estimated that there were 5 million tons of recoverable coal. Each of petitioners' expert witnesses indicated that it is not only common for Sewell coal to be mined from seams narrower than 30 inches, but that it may be done profitably. Petitioners produced evidence showing that commercial mining machines can mine coal at 24 or 26 inches. James Harris, a Fenwick investor, has operated a mining machine repair business. Although not an expert witness, he testified that mining machines can mine 26-inch coal without damaging the machines. He further testified that aside from normal wear and tear, mining thin seam coal will not cause a mining machine to wear *208 out or be damaged. Mr. Breeding, petitioners' expert witness, concluded that the average height of the Sewell coal seam on the Hewitt tract was 31.4 inches. This is an average of the known data points both on the Hewitt tract and within 2,000 feet of the property. He testified that in 1976, the cost to mine Sewell coal on the Hewitt tract would have been slightly over $ 13.00 a ton. Respondent's expert witnesses, Mr. Joyce and Mr. Jaron, stated that the cost to mine Sewell coal on the Hewitt tract in 1976 was $ 40.37 per ton, assuming an average 26-inch seam. They concluded that Fenwick could not make a profit from deep mining operations on the property because the market price was below cost. Mr. Joyce and Mr. Jaron stated in their report that, with the exception of 54,000 tons of coal which could be surface mined, none of the coal on the Hewitt tract could be mined at a profit. They constructed an isopach map to estimate the thickness of the coal on the Hewitt tract in various places. To construct an isopach map, the known thickness of the coal at several points is determined and lines are then drawn connecting these observation points. The thickness of the coal between the various *209 points of observation is assumed to increase or decrease at a uniform rate. An accurate isopach map assumes that there is a consistent increase or decrease in the coal height between various observation points. While the use of isopach maps is commonly used to evaluate certain tracts of coal, it is not always conclusive for Sewell seam coal. The thickness of Sewell coal can change radically over a short distance. Mr. Jaron testified that the partnership should have spent between $ 50,000 to $ 100,000 to determine the actual amount of coal reserves on the Hewitt tract before leasing the property. Mr. Jaron further testified that the Sewell seam is "erratic in nature," meaning that the seam is subject to thinning and thickening without continuity. Petitioners' expert, Mr. Spotte confirmed this several times and indicated that Sewell seam is "very erratic" and a "most difficult seam to mine." In 1976, the cost to drill a hole to sample the thickness of a coal mine seam was $ 12 to $ 15 a linear foot plus the additional costs to set up the drilling rig, cut roads, pump water, lay water lines, and grade the land for the drilling machinery. According to the Joyce report, a prudent investor *210 would require drill holes to be made every 500 feet to estimate the amount of coal present. Mr. Jaron stated that sixteen drill holes could be made on the Hewitt tract for a cost of $ 60,000. To estimate the amount of mineable coal on the Hewitt tract, Mr. Joyce and Mr. Jaron assumed that no coal under 30 inches could be economically mined. They stated that, at best, the average height of the coal seam on the Hewitt tract was 26 inches, and that it was highly unlikely that even this height would be found. The opinions of experts are admissible and relevant to the issue of value, but the opinions are weighed according to the expert's qualifications and other relevant evidence. Johnson v. Commissioner,85 T.C. 469, 477 (1985). This Court may reject expert testimony if judged appropriate to do so. See Helvering v. National Grocery Co.,304 U.S. 282 (1938); Chiu v. Commissioner,84 T.C. 722 (1985). After considering the expert testimony, we conclude that Mr. Spotte and petitioners' other expert witnesses have established that there was a recoverable reserve of Sewell coal in the Hewitt Tract. Petitioners' expert witnesses also established that mining the coal was economically feasible, *211 at least before the downturn in the coal industry. Mr. Jaron and Mr. Joyce failed to consider the erratic nature of Sewell seam coal, the favorable economy in 1976, and that other operations were mining Sewell coal profitably. B. STRUCTURE OF THE FINANCING Island Creek assigned the coal mining rights to the Laurel Corp. for $ 19,600 in 1975. Less than two years later, on October 26, 1976, Fenwick and Coats Run signed a Sublease Agreement for cash and a nonrecourse note totalling $ 5,350,000. Fenwick was to pay the interest and principal on the $ 4,150,000 note from the sale of coal mined on the Hewitt tract. Respondent asserts that the accrued interest is not deductible because the notes were shams, were contingent in nature, and unreasonably exceeded the fair market value of the underlying leases. We conclude that payment of the notes was contingent and unlikely. Section 163(a) provides that "there shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." We have defined "indebtedness" as "an existing, unconditional, and legally enforcible obligation for the payment of money." Kovtun v. Commissioner,54 T.C. 331, 338 (1970), affd. per *212 curiam 448 F.2d 1268 (9th Cir. 1971), cert. denied 405 U.S. 1016 (1972). One may not accrue interest if a valid obligation to pay interest does not exist. D. Loveman & Son Export Corp. v. Commissioner,34 T.C. 776, 805, 806 (1960), affd. 296 F.2d 732 (6th Cir. 1961). An accrual-method taxpayer may deduct an expense in the taxable year when all the events have occurred which determine the fact of the liability and the amount can be determined with reasonable accuracy. Section 1.461-1(a)(2), Income Tax Regs.; Vastola v. Commissioner,84 T.C. 969, 977 (1985). The presence of deferred debt that is in substance or in fact not likely to be paid, however, is an indication of a lack or an exaggeration of economic substance. Knetsch v. United States,364 U.S. 361, 369 (1960). We look to the substance and not the form of such debt. See Waddell v. Commissioner,86 T.C. 848, 900 (1986), affd. 841 F.2d 264 (9th Cir. 1988). Petitioners acknowledge that contingent liabilities may not be accrued and deducted while they are still contingent. Security Flour Mills Co. v. Commissioner,321 U.S. 281, 284 (1944); Bennet Paper Corp. v. Commissioner,78 T.C. 458, 470 (1982), affd. 699 F.2d 450 (8th Cir. 1983). *213 They further concede that payment of a nonrecourse note which is wholly contingent on production is illusory and inherently inconsistent with the regulatory definition of a royalty provision. Maddrix v. Commissioner,83 T.C. 613, 623 (1984), affd. 780 F.2d 946 (11th Cir. 1986). Such notes fail to establish all the events necessary to determine the fact of liability. Brountas v. Commissioner,692 F.2d 152, 161 (1st Cir. 1982), vacating and remanding on other grounds 73 T.C. 491 (1979); Gibson Products Co. v. United States,637 F.2d 1041, 1047-1049 (5th Cir. 1981). Petitioners argue, however, that the fair market value of the leasehold interest they acquired exceeded both the face amount of the nonrecourse note and the total acquisition price. Petitioners' experts have shown that there were recoverable reserves on the Hewitt tract, but they failed to establish that the value of the coal on the Hewitt tract approached the $ 5,350,000 paid for the rights. Respondent's expert witnesses provided substantive proof of the recoverable reserves on the Hewitt Tract and the fair market value. While this proof confirmed that there were economic coal reserves on the tract, the evidence showed *214 that it was infeasible to generate profits to match the price paid for the rights. The inherent risks in the project were so great that mining and selling the reserves to pay off the note was far from certain. Vastola v. Commissioner, supra at 978. It is clear that payment of the nonrecourse note was wholly contingent on production. The note would, and could, be paid only if the mine was productive and generated a sufficient cash flow. We conclude that the price of the Hewitt Tract was inflated. The purchase price of the property unreasonably exceeded its true value, and the note is contingent. All the events necessary to establish liability on the note did not occur. Vastola v. Commissioner, supra at 979. Accordingly, it is improper for the partnership to deduct the nonrecourse note portion of the advance royalty. Flowers v. Commissioner, supra; section 1.461-1(a)(2), Income Tax Regs.
C. SECTION 6621 ADDITIONAL INTEREST Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6621(b) if there is a "substantial underpayment" (an underpayment of at least $ 1,000) in any taxable year "attributable to one or more tax-motivated transactions." *215 Stanley Works v. Commissioner,87 T.C. 389, 414 (1986). The increased rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). Solowiejczyk v. Commissioner,85 T.C. 552, 556 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). We have held that the partnership's activities constituted an activity engaged in for profit. There is no other applicable category of tax-motivated transactions appearing from the facts in this case and the legal conclusions of our opinion. Compare Ferrell v. Commissioner,90 T.C. 1154, 1203-1207 (1988). Accordingly, with respect to interest on the underpayments which has accrued after December 31, 1984, we conclude that petitioners are not liable for the increased rate under section 6621. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise provided.
2. Counsel selected these petitioners with the approval of the Court to be a test case. This test case will serve to resolve numerous issues common to a much larger group of individuals who were also limited partners in Fenwick Associates, Ltd.↩
3. The factors include: (1) the manner in which a taxpayer carries on the activity; (2) the expertise of the taxpayer or his or her advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation involved in the activity. Section 1.183-2(b), Income Tax Regs.↩