S. Peter LEBOWITZ and Theresa Lebowitz, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 1021, Docket 89–4144.

United States Court of Appeals, Second Circuit.

Argued March 26, 1990.

Decided Nov. 1, 1990.

John L. Pritchard, Parsippany, N.J. (Thomas S. Carles, Carles & Carles, of counsel), for petitioners-appellants.

Richard Farber, Tax Div., Dept. of Justice, Washington, D.C. (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, Linda Mosakowski, of counsel), for respondent-appellee.

Before OAKES, Chief Judge, WINTER and MINER, Circuit Judges.

OAKES, Chief Judge:

This tax appeal, involving the proper income tax treatment of a nonrecourse note, is from a decision of the United States Tax Court, Mary Ann Cohen, *Judge*, entered on June 21, 1989 and unofficially reported at 57 T.C.M. (CCH) 179 (1989), adopting the opinion of the Special Trial Judge, Hu S. Vandervort.

In December 1976, taxpayer S. Peter Lebowitz became a limited partner in the coal mining partnership of Fenwick Associates ("Fenwick"). Fenwick, which operates under the accrual method of accounting on a calendar-year basis, was formed as a New York limited partnership to lease and mine certain coal property in West Virginia. Pursuant to this purpose, Fenwick subleased approximately 1,886 acres in Nicholas County, West Virginia (the "Hewitt tract") from Coats Run Energy, Inc. ("Coats Run"). An engineering report dated October 8, 1976 had concluded on the

basis of a recovery percentage of 60% that the tract held approximately 1,795,000 tons of Sewell coal. Sewell coal was then a premium coal well suited to making coke and steel, and its low ash and sulphur content made it popular among both utility power plants concerned with air pollution and Japanese steel-making concerns.

Prior to the sublease with Fenwick, Coats Run had contracted with one coal company to deep mine the coal in the land, and with another to strip mine the coal, each at a price of $20 per ton. At the time it subleased the mining rights to Fenwick, Coats Run assigned Fenwick both of these mining contracts. On December 16, 1976, the Sewell Coal Company ("Sewell") agreed to purchase the coal mined on the Hewitt tract for a price of $28 per ton.

Pursuant to the terms of the sublease agreement, Fenwick agreed to pay Coats Run an advance royalty of $5.35 million, made up of $1.2 million in cash and a $4.15 million nonrecourse note, secured by the mining rights. In addition, a separate agreement of sublease, executed on October 26, 1976, required Fenwick to take immediate steps to sell its limited partnership interests and to pay the advance royalty to Coats Run by December 31, 1976. In the event that Fenwick was unable to sell its limited partnership interests in the aggregate sum of $1.5 million, the agreement of sublease provided, the sublease would be cancelled and Fenwick's general partner would be obligated to pay Coats Run $25,-000 as liquidated damages.

Preparation for mining operations began in late 1976 and was completed by the summer of 1977, but mining did not commence until 1979, due to various strikes and a recession in 1978 and 1979 that had greatly reduced the demand for coal. From 1979 through 1984, coal was mined in each year, in quantities ranging from 8,400 tons in 1983 to 63,184 tons in 1984. As a result of the earlier recession, however, the price of coal was substantially depressed, and Sewell refused to honor its prerecession contract to purchase coal for $28 per ton. Coats Run, meanwhile, had been purchased by Alla Ohio Valley Coals, Inc.,

which conducted strip mining operations on the Hewitt tract between 1980 and 1982, but went bankrupt before paying Fenwick the royalty payments due. By 1983, Fenwick was unable to meet its minimum payments on its note, and Coats Run was no longer providing the required mining assistance to Fenwick. On April 4, 1983, each side being in default of its obligations, the parties executed a Moratorium Agreement.

On its 1976 income tax return, Fenwick claimed a deduction in the amount of $5.35 million for the accrual of advance royalties, and an interest expense deduction in the amount of $41,500 on the nonrecourse note. In 1977, it claimed an interest expense deduction in the amount of $249,000 on the note. S. Peter Lebowitz and his wife Theresa ("Taxpayers"), on their 1976 and 1977 returns, claimed deductions for their proportionate share of losses attributable to their limited partnership interest in Fenwick, amounting to $39,325 in 1976 and $2,192 in 1977. The Commissioner, concluding that Fenwick did not have an actual and honest objective of making a profit, and that the nonrecourse note did not represent genuine indebtedness, disallowed these deductions, and this lawsuit followed.

A crucial question in the Tax Court was the value of the coal reserved on the Hewitt tract at the time Fenwick acquired the right to mine the property. In addition to the engineering report discussed above, the taxpayers presented testimony of a mining engineer and of a retired president and chairman of the Pittston Coal Company, I.C. Spotte, as well as the testimony of two additional persons who had mined coal on the Hewitt tract. I.C. Spotte had worked in the coal industry for 40 years, and at one point his company had produced more than one million tons per year of Sewell coal. He estimated that there were five million tons of recoverable coal on the Hewitt tract, that the cost of recovery in 1976 was $10 to $12 per ton, and that coal sold in that year for $45 to $55 per ton. Thus, it was his view that the coal rights on the Hewitt tract were worth significantly in excess of $5 million. Taxpayers' mining engineer testified that there were 4.5 mil-

lion recoverable tons, and that the average cost of recovery would be slightly more than $13 per ton. Taxpayers' two other witnesses indicated that, between 1979 and 1987, they extracted over 250,000 tons of coal from the Fenwick property by deep mine methods, and an additional 41,593 tons by strip mine methods.

In contrast to the taxpayers' witnesses, the Commissioner's expert witnesses stated that, in 1976, only 54,000 tons of coal could be mined from the property, and that this coal could be removed solely by surface strip mining. They also estimated that the cost of mining coal in 1976 would have been $40 per ton. The Commissioner's expert testimony was based on the assumption that no coal under 30 inches thick could be mined economically. This assumption was contrary to that of the taxpayers' expert, who testified that coal could be mined in seams as thin as 26 to 29 inches.

The Special Trial Judge appeared to credit the taxpayers' witnesses, and stated that they had established that mining the coal was economically feasible, at least before the down-turn in the coal industry. He also found that Fenwick had acquired the tract of land to mine coal, and that Fenwick made a substantial effort to prepare for operations, including obtaining mining permits, satisfying environmental requirements, constructing a road, and purchasing machinery. Nonetheless, he affirmed the Commissioner's disallowance of taxpayers' deductions, on the ground that the nonrecourse note did not represent genuine indebtedness. Specifically, he determined that the value of the Hewitt tract at the time of purchase did not amount to $5,350,-000, the combined value of the cash payment and the nonrecourse note, and, alternatively, that Fenwick's obligations under the nonrecourse note were contingent because the inherent risks in the project were so great that mining and selling the reserves to pay off the nonrecourse note was far from certain.

On appeal, taxpayers challenge the Tax Court's findings that the value of the collateral securing the nonrecourse note was not sufficiently high, and that repayment of the note itself was "contingent." Their principal argument is that, although the maker of a nonrecourse note is not personally liable for the debt, courts have considered such notes genuine obligations for income tax purposes if the face amount of the note does not unreasonably exceed the value of the collateral at the time the note is signed. The theory, taxpayers maintain, is that the maker of such a note will in fact lose a valuable asset in the event of default, and will therefore have an incentive to treat the note as a personal debt. Taxpayers concede that the debt will be considered "contingent"—and therefore not genuine—if the value of the collateral cannot be determined at the time the note is made. They maintain, however, that if the fair market value of the collateral is determinable, and if the face amount of the note does not unreasonably exceed the asset's value, the note will be considered a genuine debt and will be included in the asset's purchase price for tax purposes. As support for their position, they cite *Commissioner v. Tufts*, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983); *Crane v. Commissioner*, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947); *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976); and *Hager v. Commissioner*, 76 T.C. 759 (1981). Taxpayers go on to argue that, where books are kept on an accrual basis, as Fenwick did here, a nonrecourse note that does not unreasonably exceed the fair market value of the asset creates an actual obligation sufficient to support a deduction from income. Interest on such a note, taxpayers assert, is also properly deductible under the same analysis. *See Pleasant Summit Land Corp. v. Commissioner*, 863 F.2d 263, 274 (3d Cir.1988), *cert. denied*, — U.S. —, 110 S.Ct. 260, 107 L.Ed.2d 210 (1989).

Taxpayers contest a number of factors leading to the Tax Court's determination that the nonrecourse note signed by Fenwick did not evidence a genuine debt. First, they argue that the court misapplied the test for determining the bona fides of the debt by comparing the value of the collateral security to the total acquisition price for the coal rights, rather than mere-

ly to the face amount of the nonrecourse note. Second, taxpayers argue that the court should not have applied the "contingent obligation" analysis, because there was sufficient evidence from which to determine the value of the coal mining rights. In particular, while conceding that there is authority for the Tax Court's finding that a nonrecourse note is contingent when it is secured solely by the income stream produced by the collateral, taxpayers argue that the note in this case was secured by the coal mining rights themselves, which would be a perpetual asset in existence and subject to repossession as long as the coal remained in its natural state in the ground. Finally, relying on dicta in a number of prior decisions, taxpayers argue that the value of collateral should be fixed as of the time a note is executed, without regard to subsequent developments, and that valuation of their coal rights should therefore have been as of the time that Fenwick acquired those rights, without regard to the dramatic decline in the fair market value of those rights after they were acquired. Taxpayers point out that, upon the sale or disposition of the coal rights, the release of any existing nonrecourse debt will be considered part of the gross proceeds received, and that losses taken during the term of the investment will be recaptured as positive income upon the asset's sale, making the issue simply one of timing. They conclude by requesting that this case be remanded for a determination of whether the value of the coal rights as of the time the note was executed at least equalled the face amount of the nonrecourse note. If the value of the coal rights approximated the face amount of the note, taxpayers argue, the Commissioner's denial of taxpayers' deductions should be reversed. If the determination on remand is that the coal rights were worth less than the face amount of the nonrecourse note, taxpayers add, taxpayers would still be entitled to basis in the coal rights to the extent of their share of the fair market value of those rights.

We start by noting that the Tax Court found that taxpayers had overcome all hurdles but two. It found that royalties are considered similar to rent, and that they may be deducted as a trade or business expense under section 162(a)(3) of the Internal Revenue Code. *See* 57 T.C.M. (CCH) 179, ¶ 45,630(m), at 184 (Tax Ct. Apr. 19, 1989) (citing *Commissioner v. Jamison Coal & Coke Co.*, 67 F.2d 342 (3d Cir.1933); *Burnet v. Hutchinson Coal Co.*, 64 F.2d 275 (4th Cir.), *cert. denied*, 290 U.S. 652, 54 S.Ct. 69, 78 L.Ed. 565 (1933)). Moreover, it found that fees and operating expenses are normally an ordinary and necessary business expense, and are therefore also deductible under section 162. *See id.* (citing *Cagle v. Commissioner*, 539 F.2d 409 (5th Cir.1976); *Thomas v. Commissioner*, 84 T.C. 1244 (1985), *aff'd*, 792 F.2d 1256 (4th Cir.1986)). The Tax Court also found that Fenwick was engaged in the mining and selling of coal for profit, or, in other words, that it had an actual and honest profit objective. *See id.* at 185 (citing Income Tax Regs. § 1.183–2(b); *Dunn v. Commissioner*, 70 T.C. 715, 720 (1978), *aff'd*, 615 F.2d 578 (2d Cir.1980)). *Compare Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978) (finding a for-profit activity) *with Brannen v. Commissioner*, 722 F.2d 695 (11th Cir.1984) (concluding that the activity at issue was not engaged in for profit).[1] Finally, the Tax Court found that there was a recoverable reserve of Sewell coal in the Hewitt tract and that mining this reserve was economically feasible, at least before the down-turn in the coal industry.

Despite these findings, however, the Tax Court concluded that "it was infeasible to generate profits to match the price paid for the rights," and that the "inherent risks in the project were so great that mining and selling the reserves to pay off the note was far from certain." As a result, it determined that the price of the Hewitt tract was "inflated," that the purchase price "unreasonably exceeded its true value,"

---

**1.** For this reason, the Tax Court declined to require payment of 120% of the adjusted interest rate under section 6621(c) of the Code.

and that the note was therefore "contingent" and not a genuine obligation. *See* 57 T.C.M. (CCH) 179, ¶ 45,630(m), at 187 (Tax Ct. Apr. 19, 1989) (citing *Vastola v. Commissioner*, 84 T.C. 969, 978–79 (1985)).

■ We conclude that the Tax Court's determination that the nonrecourse obligation was not genuine was incorrect. We agree with taxpayers that the underlying question is whether the fair market value of the acquired asset approximates the amount of the nonrecourse note in question, rather than whether it approximates the entire purchase price paid. *Crane v. Commissioner*, 331 U.S. 1, 14, 67 S.Ct. 1047, 1054, 91 L.Ed. 1301 (1947), the progenitor of this type of case, held that a nonrecourse debt that does not exceed the value of the security is genuine, because, if the taxpayer defaults, he will lose an asset worth more than the amount of the debt. The critical observation in *Crane* was that the property must be "mortgaged at a figure less than that at which the property will sell." *Id.* If the value of the property is less than the value of the note, the Court suggested, the taxpayer would not have a similar incentive to pay off the debt. *See id.* at 14 n. 37, 67 S.Ct. at 1054–55; *see also Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1049 (9th Cir.1976) (reasoning that a nonrecourse note that exceeds the value of the underlying asset was not a true debt, because the taxpayer could prudently abandon the property rather than pay off the obligation); *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184, 209 (1983) (same), *aff'd*, 752 F.2d 89 (4th Cir.1985).

The Tax Court's requirement that the value of the collateral equal the entire purchase price paid, including both the nonrecourse note and the cash payment, misconstrues the teaching of our prior cases. In *Estate of Baron v. Commissioner*, 798 F.2d 65 (2d Cir.1986), and *Estate of Isaacson v. Commissioner*, 860 F.2d 55 (2d Cir. 1988), we held that the face amount of the alleged *indebtedness* must not unreasonably exceed the fair market value of the collateral underlying the note. *See Baron*, 798 F.2d at 68–69; *Isaacson*, 860 F.2d at

56. Nowhere in either case did we suggest that the value of an accompanying cash payment should be factored into this calculation. Moreover, in *Deegan v. Commissioner*, 787 F.2d 825 (2d Cir.1986) (per curiam), because the fair market value of the collateral was presumably less than the amount of the nonrecourse debt standing alone, we never explicitly addressed whether the presence of the additional cash payment was relevant to determining the bona fides of the obligation. In confronting that question today, we conclude that the proper inquiry is between the amount of indebtedness and the value of the underlying collateral. *Accord Polakof v. Commissioner*, 820 F.2d 321, 324 (9th Cir.1987), *cert. denied*, 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988); *Odend'hal v. Commissioner*, 748 F.2d 908, 912 (4th Cir.1984), *cert. denied*, 471 U.S. 1143, 105 S.Ct. 3552, 86 L.Ed.2d 706 (1985); *Brountas v. Commissioner*, 692 F.2d 152, 157 (1st Cir.1982), *cert. denied*, 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983); *Hager v. Commissioner*, 76 T.C. 759, 775 (1981); *Beck v. Commissioner*, 74 T.C. 1534, 1552 (1980), *aff'd*, 678 F.2d 818 (9th Cir.1982); Rev.Ruling 77–110, 77–1 C.B. 58.

■ We also agree with taxpayers that events subsequent to the time of purchase that affect the value of the security are irrelevant; rather, the valuation test is applicable as of the time of purchase. *See Baron*, 798 F.2d at 71; *Isaacson*, 860 F.2d at 56; *Polakof*, 820 F.2d at 324 n. 6. As such, the decline in value of Fenwick's coal rights resulting from the recession of the late 1970's should not be considered in determining whether the value of the rights equalled the face amount of the nonrecourse note.

Taxpayers would also have us hold that, even if the fair market value of the coal rights is substantially less than the face amount of the note, the Tax Court, on remand, should allow taxpayers basis in the coal rights at least to the extent of taxpayers' share of the coal rights' fair market value. We believe that taxpayers' argument overstates their case. If the obligation of the note unreasonably exceeds

the value of the underlying security, the transaction lacks economic substance. We fail to see how a taxpayer can have an incentive to pay a portion of a nonrecourse debt equal to the value of the security when an unreasonably large portion of that debt would continue to lack supporting value. To the extent that *Pleasant Summit Land Corp. v. Commissioner*, 863 F.2d 263, 277–79 (3d Cir.1988), *cert. denied*, —— U.S. ——, 110 S.Ct. 260, 107 L.Ed.2d 210 (1989) holds otherwise, therefore, we respectfully disagree. We nevertheless agree with taxpayers that there should be a remand to the Tax Court for a determination of the value of the coal rights as of October 1976, as we believe there is sufficient evidence in the record to support a finding that the value of the rights at that time was at least equal to the face obligation of the nonrecourse note.

So saying, we still have not dealt with the "contingent debt" portion of the Tax Court's opinion. In *Baron*, we disallowed deductions relating to a nonrecourse note, in part because "the value of the underlying collateral, when considered in light of all relevant circumstances, was so uncertain or elusive that the purported indebtedness must be considered too contingent to justify the depreciation or deduction of the indebtedness from basis." 798 F.2d at 69. There, however, we were dealing with nonrecourse notes secured by a percentage of the royalties produced by a movie sound track. We were careful to caution that the contingent debt analysis used in that case was inapplicable to cases in which the collateral was amenable to valuation:

> Exclusion from basis of nonrecourse debt absent a specific finding on valuation should be permitted only in "rare and extraordinary cases." ... Nonrecourse debt may be excluded from basis under the contingency principle when fair market valuation is not reasonably determinable.... Here, the value of the rights at the time of purchase was largely a function of public acceptance of both the movie and the soundtrack, neither of which had yet been released.

*Id.* at 70 (citations omitted).

■ Where property has a determinable value, payment of a nonrecourse obligation is unlikely to be speculative. Here, we think that the value of the coal mining rights was susceptible to reasonable determination, given the substantial amount of cash paid on the line, the evidence of taxpayers' good faith, and the other supporting evidence. We are not unaware of those cases holding that a debt is contingent if it is to be paid solely from the proceeds or income derived from the collateral security. *See, e.g., CRC Corp. v. Commissioner*, 693 F.2d 281 (3d Cir.1982), *cert. denied*, 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983); *Brountas*, 692 F.2d at 161–62; *Gibson Products Co. v. United States*, 637 F.2d 1041, 1049–51 (5th Cir.1981). In those cases, however, the nonrecourse notes were secured by the proceeds to be derived from oil drilling that was exploratory or "wildcat" in nature, with little or no solid evidence that there was in fact any oil at all on the properties in question. Under those circumstances, the security would be worthless unless oil was discovered and the business activity of the partnership was successful. Here, however, the note at issue was secured by a perpetual leasehold interest in proven reserves of coal, indeed coal of high quality. The value of this interest was evidenced not only by expert testimony, but also by the fact that, between June 1979 and May 1987, over 250,000 tons of coal were extracted by deep mine methods, and an additional 41,593 tons by strip mine methods, when prices for Sewell coal were low and the costs of recovery high. In holding that the note involved in this case "would, and could, be paid only if the mine was productive and generated a sufficient cash flow," therefore, the Tax Court missed the point that the security would allow full recovery even if there were no actual production, provided that, at the time the note was executed, the value of the reserves approached the $4.15 million face amount of the note.

The fact that the timing of payments to be made on the note was set according to the production of coal does not detract from our conclusion that payment on the note was not contingent. The proposition

that a debt is contingent if it is secured solely by the proceeds to be derived from the collateral does not imply that an otherwise genuine obligation will be invalid, solely because payments are to be made at the points at which the collateral produces income. Here, as long as there was sufficient coal in the ground to secure payment of the note at the time the note was executed, the only contingency would have been that the price of coal might have gone down, as in fact it did, or gone up, as it did not. Such a "contingency" does not render the obligation illusory, regardless of how payments on the note happen to have been timed.

The fact that the note in this case was secured by a perpetual interest in the coal reserves sets this case apart from *Fox v. Commissioner*, 80 T.C. 972, 1022 (1983), *aff'd sub nom., Bernard v. Commissioner*, 731 F.2d 230 (4th Cir.1984), on which the Commissioner now relies. In that case, a nonrecourse note was held to be contingent because it was payable from the proceeds of book royalties, and payment was dependent upon the success of the books as commercial enterprises. Here, however, payment on the note was secured by the value of the coal rights themselves, and did not depend on the success of the mining on the Hewitt tract. As such, the note can be compared to nonrecourse notes secured by mortgages on low-income housing projects, which the Tax Court has recognized as genuine debts. *See Mahoney v. United States*, 81–2 U.S.T.C. ¶ 9761, at 88,541 (Ct. Cl.1981) (noting that "[e]ven if the project failed to produce income, the lender could satisfy the debt by foreclosing on the assets").[2]

Nor should this case be confused with *Vastola v. Commissioner*, 84 T.C. 969 (1985), in which the Tax Court disallowed a deduction in connection with coal mining royalty payments. *Vastola* was decided under specific Internal Revenue Service regulations that strictly limited the circumstances under which advance royalties for coal mining rights could be deducted when accrued. *See* Treas.Reg. § 1.612–3(b) (1977) (preventing the immediate deduction of advance royalty payments unless the royalties were paid or accrued "as a result of a minimum royalty provision"). These regulations, having been enacted after the transaction at issue in this case, are inapplicable here. Moreover, like the note in *Fox*, the notes in *Vastola* were payable from an income stream for a limited period of time. Here, there appears to be no question that the partnership's interest was in the coal mining rights themselves, and that this interest was held in perpetuity.

Judgment reversed and cause remanded to the Tax Court.

---

2. Indeed, our recent holding in *Bailey v. Commissioner*, 912 F.2d 44 (2d Cir.1990), suggests that, even if the note were payable solely from the proceeds to be derived from the coal mining operations, a finding that the obligation was genuine might still be justified. *See id.,* at 48

("Although ... the nonrecourse nature of purchase notes, especially when they are payable out of exploitation proceeds of the purchased asset, is a factor that argues against recognition of debt as genuine, this factor is not necessarily determinative.").