The **TRAVELERS INSURANCE COMPANY, Plaintiff,**

v.

The **UNITED STATES, Defendant.**

**Nos. 494–88T, 262–89T.**

United States Claims Court.

Jan. 31, 1992.

---

E. Victor Willets, Jr., with whom was Peter H. Winslow, Washington, D.C., for plaintiff.

Stuart J. Bassin, with whom was Shirley D. Peterson, Asst. Atty. Gen., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge

These consolidated tax refund cases come before the court on defendant's motion to dismiss for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(4) of the Rules of the

United States Claims Court. RUSCC 12(b)(4) (1991).

The question before the court is whether prepayment charges [1] received by plaintiff, Travelers Insurance Company (Travelers), in relation to early repayment of corporate mortgages, should be taxed as non-insurance investment income or long-term capital gain.[2]

After extensive briefing by the parties, oral argument and a thorough examination of the voluminous legislative history and case law relevant to the issue, for the reasons set forth below, the court denies defendant's motion.

## FACTS

During the years in issue, plaintiff was at all times a life insurance company as defined in § 801(a) of the Internal Revenue Code (IRC or Code) of 1954.[3]

The tax years in dispute are 1974 through and including 1978. During those years, as part of its regular investment activities, plaintiff made mortgage loans to corporate borrowers. The mortgages provided that the notes could be retired by the corporate issuers prior to maturity upon the payment of the principle, accrued interest and a prepayment charge.

The Internal Revenue Service included the amounts of prepayment charges paid to plaintiff upon retirement of the corporate mortgage notes during the years involved as gross investment income under IRC § 804(b). Plaintiff argues that pursuant to IRC § 1232 the prepayment charges are

---

1. Throughout the course of the briefing and at oral argument, defendant has referred to these charges as "corporate mortgage prepayment penalties" while plaintiff has referred to them as "corporate mortgage prepayment premiums." For ease of discussion only, the court uses the "neutral" term "charges."

2. Three separate issues are raised in plaintiff's complaints. This motion relates only to the corporate mortgage prepayment issue. The two other issues, plaintiff's treatment of foreign currency fluctuations with respect to income from its Canadian operations and the application of the foreign tax credit provisions to income it received from an Indonesian oil venture, will be addressed in subsequent opinions.

3. Except where otherwise noted, references to the provisions of the Internal Revenue Code refer to provisions of the Internal Revenue Code of 1954 as in effect in the years in issue. Since the years in dispute, the provisions governing the taxation of life insurance companies (Subchapter L of the Code (§§ 801–820)) have been substantially amended, primarily by § 211(a) of the Tax Reform Act of 1984, Pub.L. No. 98–369, 98 Stat. 494. Section 1232, governing the capital gain treatment of amounts received on retirement of corporate obligations, was amended several times, and then repealed by § 42(a)(1) of the Tax Reform Act of 1984. The treatment of amounts received on retirement of corporate notes is now governed by Subchapter P, Part V of the Code.

considered gain, from the sale or exchange of a capital asset, which is not includible in gross investment income. During the years in suit, plaintiff claims it received in excess of $1 million in corporate prepayment charges.

## DISCUSSION

### Motion To Dismiss

In ruling on a motion to dismiss for failure to state a claim upon which relief can be granted, the court must presume all factual allegations of the complaint to be true, and must make all reasonable inferences in favor of the non-moving party. *Miree v. Dekalb County*, 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977). A motion brought under RUSCC 12(b)(4) should be denied, "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

### IRC §§ 804(b) and 1232

In order to decide the case, the court must decide whether an exception is created by § 1232 for corporate mortgage prepayment charges which would preclude those amounts from being treated as gross investment income under § 804(b).[4]

Section 1232 was enacted in response to development of tax avoidance devices involving original issue discount (OID). The situation is illustrated by the following simple example: A borrower seeks a loan of $100 repayable in 10 years at a 10 percent rate of interest. Under a conventional loan, a lender loans $100 to the borrower in 1930. The borrower agrees to pay the lender $10 each year as interest on the loan and to repay the lender the full $100 of principle in 1940. Under an OID loan, the lender also agrees to loan $100 to the borrower in 1930. No interest is charged on the loan, but the borrower agrees to pay the lender $200 in 1940 upon retirement of the loan. From a tax perspective, there is no question that the lender in the conventional loan situation must recognize $100 in interest income over the course of the term. There has been disagreement, however, over the tax treatment of the OID loan. In *Commissioner v. Caulkins*, 144 F.2d 482 (6th Cir.1944), which predates the 1954 IRC in which § 1232 was enacted, repayment of the OID loan in the example above was treated as an exchange of the $100 loan for $200 10 years later. The lender was allowed to recognize $100 in capital gain treatment in 1940. This gave the OID lender two advantages over the conventional lender. The $100 of capital gain realized in the OID loan was taxed at a lower rate than the $100 of interest income realized by the lender in the conventional loan. Secondly, the OID lender did not pay any tax until 1940 while the lender in the conventional loan paid tax in earlier years. Given the time value of money, the OID lender was in a better position than the conventional lender because it had deferred its tax liability as well as reduced the rate. The various amendments to the OID provisions have attempted to provide for equal tax treatment of the two types of loans.

In this case, defendant argues that the prepayment charges which the plaintiff received are income that is includible in the gross investment income of a life insurance company under § 804(b), as income received from the alteration or termination of an instrument or agreement from which interest is derived. Plaintiff concurs that prepayment charges would be includible in gross investment income under § 804(b) alone. However, this is not so, argues plaintiff, if they are capital gain as defined under § 1232. Plaintiff claims that by virtue of § 1232(a)(1) the retirement of corporate notes is considered a sale or exchange of a capital asset. Once the required sale or exchange is established, § 1232(a)(2) determines the character of the gain. In this case this leads to a determination that the gain is a capital gain.

---

4. For ease of discussion, IRC §§ 804(b) and 1232 are provided in Appendices A and B, respectively, at the end of this opinion.

The capital gain character is preserved, plaintiff maintains, for purposes of computing life insurance company taxable income by § 804(b). Although § 804(b)(1)(C) states that income derived from the alteration or termination of any instrument or agreement from which a life insurance company derives interest will be treated as gross investment income, that provision is limited, according to plaintiff, by the last sentence of § 804(b): "in computing gross investment income under this subsection, there shall be excluded any gain from the sale or exchange of a capital asset, and any gain considered as gain from the sale or exchange of a capital asset." Plaintiff contends that this savings clause preserves capital gain treatment for any item that is received from the termination of an instrument from which the insurance company received interest income to the extent that capital gain treatment is provided for somewhere else in the Code.

Defendant acknowledges that a "wooden reading" of § 1232(a)(2) supports plaintiff's contention. Defendant urges the court to reject such a contention because the bare statutory language should be construed in conjunction with the entire statutory scheme and the policy objectives of the law.

*Interest Substitute Theory*

The issue of the characterization of prepayment charges for taxation purposes has been before the courts before. Defendant uses these prior decisions to argue that even if the § 804(b) capital gains exclusion modifies the § 804(b)(1)(C) definition of income, the charges would still be gross investment income because the courts have consistently held that amounts such as the ones at issue do not represent gain from the sale or exchange of capital assets.

The courts, defendant maintains, have universally rejected plaintiff's contention. They have generally relied on an economic analysis of these amounts to support the view that the charges are a substitute for interest, an ordinary income item, not a gain from the sale or exchange of a capital asset. The charges are considered an added fee charged for changing the agreed

period of the mortgage loan. This fee serves to equalize the difference between the total interest actually received by the lender on the prepaid loan and the amount which would have been payable over the originally agreed term of the loan. The charge thus acts as a substitute for any lost interest the lender originally expected to earn.

Defendant argues that this court is bound by the controlling precedent of two Court of Claims decisions which have rejected plaintiff's contentions on similar issues under the Internal Revenue Code of 1939: *Prudential Ins. Co. of America v. United States*, 319 F.2d 161, 162 Ct.Cl. 55 (1963) and *Equitable Life Assurance Soc'y v. United States*, 181 F.Supp. 241, 149 Ct. Cl. 316, *cert. denied*, 364 U.S. 829, 81 S.Ct. 68, 5 L.Ed.2d 56 (1960). When briefing began in this case, the Tax Court had decided this same issue in favor of the defendant, holding that in computing its gross investment income under § 804(b), the petitioner life insurance company must include prepayment charges as income described under § 804(b)(1)(C). *Prudential Ins. Co. of America v. Commissioner*, 90 T.C. 36 (1988).

During the course of briefing in this case, the *Prudential* decision was reversed. *Prudential Ins. Co. of America v. Commissioner*, 882 F.2d 832 (3d Cir.1989). The Third Circuit held that prepayment charges on the retirement of corporate mortgages are not interest equivalents. The court found that the insurance company's receipt of prepayment charges on corporate mortgages qualified for long-term capital gain treatment under § 1232 and that these amounts were not gross investment income under § 804(b).

Subsequently, the Tax Court revisited the issue. *Phoenix Mutual Life Ins. Co. v. Commissioner*, 96 T.C. 481 (1991). Because appeal of the *Phoenix* case would be in the Second Circuit, the Tax Court was not bound by the Third Circuit's *Prudential* decision. In *Phoenix*, the Tax Court explicitly stated it would no longer follow its previous opinion in *Prudential* and held that prepayment charges upon the early

retirement of mortgage loans made to corporate borrowers are to be treated as long-term capital gain and, as such, are excludable from a life insurance company's gross investment income under § 804(b).

The court finds the well reasoned and thorough decision of the Tax Court in *Phoenix* both enlightening and persuasive. The Tax Court based its holding, in large part, on the plain meaning of § 1232. "A literal reading of section 1232 leads us to characterize the prepayment premiums as capital gain." *Phoenix*, 96 T.C. at 484. The court noted that in *Prudential* it had held that the common law treatment of mortgage prepayment charges as "interest substitutes" precluded capital gain treatment under § 1232.

As the Tax Court notes in *Phoenix*, however, "the cases cited in our *Prudential* opinion with respect to the common law treatment of prepayment charges did not involve or consider section 1232; the mortgages in those cases were issued prior to the 1954 enactment of section 1232...." *Id.* The cases referred to by the Tax Court in the above statement include the *Equitable* decision of the Court of Claims. The Court of Claims *Prudential* decision, not cited by the Tax Court but discussed in defendant's brief, also falls into this category.

Finding that the plain language of § 1232 provides that corporate mortgage prepayment charges are capital gains, one needs only to look at the final sentence of § 804(b) to exclude these amounts from gross investment income.

### Legislative History

Both parties spent extensive portions of their briefs arguing that the voluminous legislative history related to these tax provisions supported their positions. While the parties presented thorough and well reasoned analyses, the court finds that a recitation of the arguments presented by both sides is unnecessary.

To begin with, in the entire legislative history the parties cite, only one specific reference to mortgage prepayment charges is found.

Subsection (b)(1) includes in the definition of "gross investment income" the gross amount of any income, received or accrued, during the taxable year, from interest, dividends, rents and royalties. It is made clear that income includes the gross amount received in conjunction with the making of any lease, mortgage or other instrument or agreement from which the life insurance company will derive interest, rents or royalties, and the alteration or termination of any such lease, etc. *Examples of such amounts would be a penalty for early payment of a mortgage* and a bonus for entering into a lease. Any amount received in conjunction with an agreement which would be deemed a capital gain under other provisions of the Internal Revenue Code will not be included in gross investment income.

H.Rept. No. 1098, 84th Cong., 1st Sess., (1955), 1956–1 C.B. 954, 961 (emphasis added). While the language cited above would seem to suggest that a penalty for early payment of a mortgage might not quality for capital gain treatment, plaintiff correctly points out that a significant portion of most life insurance companies' prepayment charges are received on obligations that do not satisfy the requirements of § 1232. Mortgages to non-corporate borrowers, for example, do not qualify as capital assets and prepayment charges received in relation to those mortgages would not qualify for capital gain treatment. The Third Circuit agreed with this argument. *Prudential*, 882 F.2d at 839.

The remainder of the legislative history is offered by defendant to argue that the fact that corporate mortgage prepayment charges were not mentioned implies that Congress did not want to include them as capital gain. Plaintiff cites the same legislative history to argue that the omission of any mention of corporate mortgage prepayment charges implies that Congress did want the amounts to receive capital gain treatment.

Finding the legislative history to be inconclusive and because the court's decision turns on the plain language of the sections

involved, no further examination is necessary.[5]

### CONCLUSION

The court finds that corporate mortgage prepayment charges qualify for capital gain treatment pursuant to the explicit language of § 1232. The exclusion provision of § 804(b) precludes these amounts from being included as gross investment income. Plaintiff is entitled to capital gain treatment for these amounts.

Defendant's motion is therefore denied. The parties shall file a joint status report relating to further proceedings on this issue within 60 days of this opinion.

IT IS SO ORDERED.

### Appendix A

Sec. 804   Taxable Investment Income.

(b) Gross investment income.—For purposes of this part, the term "gross investment income" means the sum of the following:

(1) Interest, etc.   The gross amount of income from:

(A) interest, dividends, rents, and royalties,

(B) the entering into of any lease, mortgage, or other instrument or agreement from which the life insurance company derives interest, rents, or royalties, and,

(C) the alteration or termination of any instrument or agreement described in subparagraph (B).

(2) Short-term capital gain.   The amount (if any) by which the net short-term capital gain exceeds the net long-term capital loss.

(3) Trade or business income.   The gross income from any trade or business (other than an insurance business) carried on by the life insurance company, or by a partnership of which the life insurance company is a partner.   In computing gross income under this paragraph, there shall

be excluded any item described in paragraph (1).

Except as provided in paragraph (2), in computing gross investment income under this subsection, there shall be excluded any gain from the sale or exchange of a capital asset, and any gain considered as gain from the sale or exchange of a capital asset.

### Appendix B

Sec. 1232   Bonds and other Evidences of Indebtedness.

(a) General Rule.   For purposes of this subtitle in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or by any government or political subdivision thereof—

(1) Retirement.   Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954).

(2) Sale or Exchange.

(A) Corporate Bonds Issued After May 27, 1969.   Except as provided in subparagraph (C), on the sale or exchange of bonds or other evidences of indebtedness issued by a corporation after May 27, 1969, held by the taxpayer more than 1 year, any gain realized shall (except as provided in the following sentence) be considered gain from the sale or exchange of a capital asset held for more than 1 year.   If at the time of original issue there was an intention to call the bond or other evidence of indebtedness before maturity, any gain realized on the sale or exchange thereof which does not exceed

---

**5.** The parties also extensively briefed the law on bond call premiums and bond premiums. Again, because the court bases its finding on the plain language of the relevant tax provisions, it is not necessary to address these analogies.

an amount equal to the original issue discount (as defined in subsection (b)) reduced by the portion of original issue discount previously includible on the gross income of any holder (as provided in paragraph (3)(B)) shall be considered as ordinary income.

(B) Corporate Bonds Issued On or Before May 27, 1969, and Government Bonds. Except as provided in subparagraph (C), on the sale or exchange of bonds or other evidences of indebtedness issued by a government or political subdivision thereof after December 31, 1954, or by a corporation after December 31, 1954, and on or before May 27, 1969, held by the taxpayer more than 1 year, any gain realized which does not exceed

(i) an amount equal to the original issue discount (as defined in subsection (b)), or

(ii) if at the time of original issue there was no intention to call the bond or other evidence of indebtedness before maturity, an amount which bears the same ratio to the original issue discount (as defined in subsection (b)) as the number of complete months that the bond or other evidence of indebtedness was held by the taxpayer bears to the number of complete months from the date of original issue to the date of maturity,

shall be considered as ordinary income. Gain in excess of such amount shall be considered gain from the sale or exchange of a capital asset held more than 1 year.