Holmes, J., concurring in the result only: Calloway and Derivium agreed to what Calloway claims was a nonrecourse loan secured by his stock. In exchange for money, Calloway transferred control of the stock to Derivium. Derivium sold the stock on the open market. The tax rules would seem to be easy to apply. Section 1.1001-2(a)(4)(i), Income Tax Regs., provides that “the sale * * * of property that secures a non-recourse liability discharges the transferor from the liability.” Commissioner v. Tufts, 461 U.S. 300, 308-09 (1983), and Crane v. Commissioner, 331 U.S. 1, 12-13 (1947), teach that the amount realized includes any nonrecourse liability secured by the property sold. Calloway would then have to recognize the difference between the discharged debt (i.e., the amount of the loan proceeds plus one day’s accrued interest minus his basis in the stock). That would be enough to solve the only substantive issue in this case. The majority (admittedly at the Commissioner’s behest) instead goes off on a frolic and detour through an inappropriate multifactor test, applies it in dubious ways, and ends up reaching an overly broad holding with potentially harmful effects on other areas of law. I. The key mistake the majority makes is analyzing two transactions as one. These two transactions were the purported loan as set forth in the Master Agreement and Derivium’s subsequent secret sale of Calloway’s stock to an unrelated party. It’s the characterization of the first transaction — the one that Calloway actually knew about because he signed the Master Agreement — that should be our focus. The subsequent sale, though it must be analyzed for its own tax consequences, should not affect our characterization of the purported loan. Accord People v. Derivium Capital, LLC, No. 02AS05849 (Cal. Super. Ct. Nov. 5, 2003) (“While the immediate liquidation of the security may have many untoward impacts upon the parties to the transaction, those potential impacts have no apparent relevance to the bona fide nature of the primary transaction.”). The majority concludes that the initial transfer of stock between Calloway and Derivium was a sale without ever finding that Calloway knew that Derivium would sell the stock collateralizing the loan. Its holding is that Derivium’s right to sell was a sale. Collapsing Derivium’s contractual right to sell into the subsequent sale would be appropriate if Calloway was splintering one transaction into two for no other purpose than to avoid taxes — where the transactions were otherwise “integrated, interdependent, and focused toward a particular result.” Pierre v. Commissioner, T.C. Memo. 2010-106 (describing the step transaction doctrine) (citing Commissioner v. Clark, 489 U.S. 726, 738 (1989)). But here, where Derivium represented to its clients that it intended to hold the stock and never told them of the quick sale, one cannot say that these transactions were integrated or interdependent. II. To arrive at its destination, the majority uses Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221 (1981). In Grodt & McKay, we had to distinguish between a sale and a sham involving the purported sale of cattle. In this case, the parties aren’t arguing about whether there was a sale or a sham, but about whether there was a sale or a loan. If we are going to compare apples to oranges, we could just as easily use the test for distinguishing a loan from compensation in Haag v. Commissioner, 88 T.C. 604, 616 n.6 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988), or the test for distinguishing a loan from stock redemption in Rogers v. United States, 281 F.3d 1108 (10th Cir. 2002), but those tests, too, contain irrelevant factors and are inexact in capturing the essence of the distinction we need to make in this case. Grodt & McKay is just the wrong test for analyzing this transaction. Of course, if there is no on-point guidance, it is helpful to borrow from tests that may be otherwise inapplicable, if we stay alert to any differing circumstances. In this case I believe there is a more relevant test. Welch v. Commissioner, 204 F.3d 1228 (9th Cir. 2000), affg. T.C. Memo. 1998-121, for example, sets out the defining characteristics of a loan, listing seven factors that courts have considered, none of which would have to be dismissed as inapplicable to this case. A good test should also reflect the nature of the property involved to determine the relevant factors, the proper weight for each factor, and whether any additional factors would be useful. See, e.g., Torres v. Commissioner, 88 T.C. 702, 721-22 (1987); Rev. Rul. 2003-7, 2003-1 C.B. 363. The majority starts down the right path by excluding payment of property taxes as a sign of ownership (recognizing its inapplicability to stock), majority op. p. 36, but then it stops short, not analyzing the significant differences between the fungible and intangible property at issue in this case and the nonfungible and tangible property at issue in Grodt & McKay.[1] One would think from reading the majority’s opinion that this is a new problem, but it isn’t. See, e.g., United Natl. Corp. v. Commissioner, 33 B.T.A. 790 (1935) (finding a 100-percent loan on the value of stock, even though originally characterized by the participants as a sale, was in fact a loan); Fisher v. Commissioner, 30 B.T.A. 433 (1934) (declining to recharac-terize a purported sale of stock as a loan). III. The Grodt & McKay test might be helpful if the majority adapted it to match the actual facts of this case instead of applying it without consideration of how shares of stock differ from livestock and how distinguishing a loan from a sale is different from distinguishing a sale from a sham. Consider: Title and Possession. The clumsiness of using Grodt & McKay is most striking in its focus on title and possession. These factors don’t jibe well with the way stock is actually held. As far back as 1908, in Richardson v. Shaw, 209 U.S. 365, 377-78 (1908), the Supreme Court realized that a shareholder could retain ownership without title or possession when a broker purchased and held the shares for the shareholder’s account: [I]n no just sense can the broker be held to be the owner of the shares of stock which he purchases and carries for his customer. * * * % # # # % ;fc * * * Upon settlement of the account * * * [the broker] receives the securities. In this case the broker assumed to pledge the stocks * * * because by the terms of the contract * * * he obtained the right from the customer to pledge the securities upon general loans, and in like manner he secured the privilege of selling when necessary for his protection. Stock ownership today is even farther removed from tangible-property concepts like title and possession owing to the rapid evolution of the indirect holding system. The official title holder of most publicly traded securities, and possessor of most physical stock certificates, is Cede & Co. — “the nominee name used by The Depository Trust Company (‘dtc’), a limited purpose trust company organized under New York law for the purpose of acting as a depository to hold securities for the benefit of its participants, some 600 or so broker-dealers and banks.” U.C.C. art. 8 (1994) (prefatory note). The U.C.C.’s drafters[2] estimate that somewhere between 60 and 80 percent of publicly traded securities are held by the brokers and banks that participate in the DTC.[3] If someone within this large network of brokers sells stock to a purchaser also within the network, the purchase and sale are netted against each other and the underlying stock remains in Cede & Co.’s name. See id. This means that even when there is an undisputed sale of stock the title holder often does not change. The majority concludes that legal title passed when Calloway “transferred the IBM stock to Derivium’s Morgan Keegan account.” Majority op. p. 34. But if the IBM shares are titled to Cede & Co. — as most publicly traded stock is — then title didn’t actually change. The right of possession similarly makes some sense when talking of cows. The owner of a cow is likely to be able to put it in the barn of his choice, but possession is unhelpful to determine the owner of shares of stock. Consider a true loan secured by stock. In most cases, creation of a security interest in stock is no longer delivering a physical certificate or noting the pledge on the books of the issuing corporation; it’s a matter of contracting with a lender who is (as a matter of contract) allowed to sell, repledge, relend, etc. the stock involved.[4] Under the U.C.C., in fact, a lender with a secured interest in shares of stock must obtain effective “control” over them to maintain priority — that is, he must take all steps so that he may sell the securities without further permission of the borrower. Id. sec. 8-106 cmt. 1. One accepted way to obtain control is to have the borrower transfer his position to the lender on the books of the securities issuer or broker. Id. sec. 8-106(d)(1). When this happens, so far as the broker, the securities issuer, or the rest of the outside world is concerned, the secured party is the registered owner entitled to all rights of ownership, but the debtor remains the owner as between him and the secured party. See id. sec. 9-207 cmt. 6 (Example) (2000). This makes secured lending collateralized by securities look very similar to a sale if measured by title and possession. See, e.g., id. sec. 8-106 cmt. 4. Obligation To Deliver Deed. Perhaps the most striking proof of the inaptness of Grodt & McKay for this case is its attention to “whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments.” Grodt & McKay, 77 T.C. at 1237. The majority construes this to mean an obligation by Calloway to transfer control of his stock and of Derivium to transfer money. Majority op. p. 35. A focus on whether there are current obligations to deliver and pay makes perfect sense in distinguishing between a sale of cattle and a sham transaction. As between those two characterizations, if there is a current obligation to exchange money for possession of cattle the transaction is more likely a sale. But this factor only shows how little use the Grodt & McKay test can be in distinguishing a loan from a sale, where there is of course an obligation for Derivium to transfer money — that’s the whole point of a loan. And every pledge loan includes a transfer of possession of a chattel (i.e., collateral). That doesn’t make pawnshops the buyers of every bit of their collateral. See, e.g., R. Simpson & Co. v. Commissioner, 44 B.T.A. 498, 499 (1941) (noting that pawnbroker’s business was lending money on personal property), affd. 128 F.2d 742 (2d Cir. 1942). And in the case of stock, where the concept of possession has become so illusory, the usefulness of execution of a “deed” seems even less helpful than the concept of passing “title”. The rest of the factors don’t much help either. Whether an Equity Was Acquired in the Property. The majority refers to this as “Equity Inherent in the Stock”, majority op. p. 35, but it isn’t clear what “inherent equity” is or how that concept would apply to stock, which is not only intangible and fungible, but divisible. As used in Grodt & McKay, this factor describes not rights, but value. Grodt & McKay, 77 T.C. at 1238 (“Petitioners ostensibly paid $6,000 per head for cows they knew were worth far less and which we find had a fair market value not in excess of $600 per head.”). If anything, this suggests that Calloway retained an equity in the stock for the short time before Derivium sold it. After all, he got only 90 percent of its fair market value. And in finding that this factor weighs in favor of a sale, the majority states that the effectiveness of the arrangement depended on Derivium’s ability to acquire and deliver the required number of shares in 2004 but fails to note how this is inconsistent with a loan — the success of every term loan depends on the ability of the parties to perform at the end of the term. (It also assumes that from Calloway’s perspective, Derivium wasn’t going to keep the collateral in its account and hedge against fluctuations in its value.) Perhaps the majority intends to suggest that there is a due diligence requirement on the part of the borrower that was not completed here. This makes sense — an apparent inability to return collateral, repay a loan, or fund a loan in the first place would weigh against finding the parties truly intended a loan. See, e.g., Gouldman v. Commissioner, 165 F.2d 686, 690 (4th Cir. 1948), affg. a Memorandum Opinion of this Court. But there is no explanation of this point and no indication whether there was anything at the time that should have warned Calloway that Derivium would not be able to perform. Risk of Loss and Receipt of Profits From the Operation and Sale of the Property. In today’s world, when dealing with intangible, fungible securities, I agree with Judge Halpern that the benefits and burdens of ownership are “beside the point” in determining who is the owner for tax purposes. Halpern op. p. 51. Stock owners who want to keep their stock but hedge against risk or sell benefits have long had various methods available to trade away the benefits and burdens of ownership without affecting tax ownership. See Kleinbard, “Risky and Riskless Positions in Securities,” 71 Taxes 783, 786 (1993) (“The economic risk/reward analysis applicable in determining tax ownership under a sale-leaseback of a building or other tangible property is difficult to apply sensibly in the context of publicly traded securities.”). In some cases, “the traditional determination of who bears market risk is more than simply not dispositive, it in fact is negatively correlated to the tax conclusion.” Id. at 794. This is consistent with our correlative holding that an option to purchase stock, even though entitling the holder to the benefits of appreciation, isn’t a present interest in stock. Hope v. Commissioner, 55 T.C. 1020, 1032 (1971), affd. 471 F.2d 738 (3d Cir. 1973). If the majority’s analysis is applied broadly, stockowners will be surprised to find out that they unwittingly sold their stock by engaging in common hedging transactions. As a practical matter, the majority also seems to overlook that Calloway bore the risk of the first 10 percent of loss in that he realized only 90 percent of the stock’s value in 2001. It appears to treat the remaining 10 percent as the price of an option (used colloquially, rather than as a derivative instrument of the sort traded in the options markets). The majority also glosses over the fact that Calloway theoretically retained most of the stock’s upside via his power to repay the loan for a return of collateral coupled with his right to dividend payments. IV. A. The majority’s approach has the potential to wreak some havoc on the unsuspecting. For instance, the majority seems to say that a nonrecourse loan — that is, a loan where the borrower has the option to surrender collateral instead of repay — does not include an obligation to repay. Particularly relevant here, the majority notes that for a loan to exist, “‘there must have been, at the time the funds were transferred, an unconditional obligation on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment.”’ Majority op. p. 37 (quoting Haag, 88 T.C. at 615-16. The majority continues: “Often it comes down to a question of substance over form requiring courts to ‘look beyond the parties’ terminology to the substance and economic realities.’” Majority op. p. 37. From there the majority concludes that the transaction lacked the characteristics of a true loan because “[pletitioner would have no personal liability to pay principal or interest to Derivium, and it would have made no sense to do so unless the value of the stock had substantially appreciated.” Majority op. p. 38. That’s way too broad a statement of the law if taken seriously. Before this case, nonrecourse loans have satisfied the obligation-to-repay test if, at the beginning of the loan, it would make economic sense for the borrower to pay it off. Tufts, 461 U.S. at 312. In other words, if the loan is overcollateralized at its inception, courts find an obligation to repay and a reasonable prospect of repayment. See Odend’hal v. Commissioner, 748 F.2d 908, 912 (4th Cir. 1984), affg. 80 T.C. 588 (1983). Events that occur after that time are immaterial to this initial characterization. See Lebowitz v. Commissioner, 917 F.2d 1314, 1318 (2d Cir. 1990), revg. T.C. Memo. 1989-178. On the facts of this case, Calloway — whose loan was overcollateralized by 10 percent— had a bona fide obligation to repay. Nonrecourse financing is a perfectly normal part of the business world. See Robinson, “Nonrecourse Indebtedness,” 11 Va. Tax Rev. 1, 10 (1991) (“The legitimacy of financing with nonrecourse indebtedness is widely recognized”). Some states have nonrecourse financing for residential mortgages, e.g., Cal. Civ. Proc. Code sec. 580b (West 1976 & Supp. 2010), and of course the entire pawnshop industry is built on it. See National Pawnbrokers Association, “Pawnbroking Industry Overview” (2008-09), available at http://www. nationalpawnbrokers.org/files/Industry%200verview%207-7-09.pdf. A general statement about the unconditional obligation to pay as a key characteristic of debt shouldn’t be read to say that such secured, but nonrecourse, financing isn’t a species of loan.[5] B. A second way in which the majority’s holding is too broad is that it implies that giving a secured lender the right to sell underlying stock without notice to the borrower turns a loan into a sale. But this is common in margin accounts, as the SEC warns: “Some investors have been shocked to find out that the brokerage firm has the right to sell their securities that were bought on margin — without any notification”. Securities and Exchange Commission, “Margin: Borrowing Money To Pay for Stocks”, http://www.sec.gov/investor/pubs/ margin.htm; see also supra note 4. And the majority’s holding is also inconsistent with the current form of most stock ownership. In the case of stock that is held through an intermediary such as Cede & Co., the U.C.C. refers to the stock owner as the “entitlement holder” and refers to the interest in the stock as the “security entitlement.” U.C.C. sec. 8 — 102(a)(7), (17) (1994). As discussed above, if a stock owner — or “entitlement holder” — wishes to borrow against his “security entitlement,” the secured lender must take “control” to maintain priority over other creditors. Borrowers can give a lender control by transferring their position to the lender on the books of the securities intermediary, id. sec. 8-106(d)(1), or by arranging for the securities intermediary to act on instructions directly from the lender, id. sec. 8-106(d)(2). In essence, a lender has control when he takes “whatever steps are necessary, given the manner in which the securities are held, to place itself in a position where it can have the securities sold, without further action by the owner.” Id. sec. 8-106 cmt. 1. Therefore, a secured lender customarily has a contractual right to sell without notice or demand, subject to its exercise in good faith.[6] See, e.g., Kaplan v. First Options of Chi. Inc., 143 F.3d 807, 818 (3d Cir. 1998) (then-Circuit Judge Alito). The majority’s holding — what I fear it could be boiled down to — is that this transaction was a sale because the advance of money was nonrecourse and Derivium had the authority to sell after taking possession of the stock. Given modern conditions in which a lender’s authority to sell stock is routine and even necessary, the real effect of the holding would be to treat all nonrecourse lending against stock collateral as sales. The majority does not appear to realize how startling that would be. V. The Grodt & McKay test, like other transaction tests, also notes that the intention of the parties governs the true nature of a transaction. Grodt & McKay, 77 T.C. at 1237; see also Welch, 204 F.2d at 1230; United Natl., 33 B.T.A. at 794; Fisher, 30 B.T.A. at 440. Intent is seen by courts “as evidenced by the written agreements read in light of the attending facts and circumstances”. Grodt & McKay, 77 T.C. at 1237 (citation omitted). If the test is stated that generally, no one can disagree. But in addition to the problems caused by this test in this case, the majority does not analyze the effect of deception. We are confronted here with one party who was not being honest with the other about its intentions. (The Commissioner admits generally that Derivium told its customers that it intended to hold the stock and hedge against the upside risk via a proprietary trading strategy. Reqs. for Admis. 264, 276.) Despite the importance of intent in these tests, the majority doesn’t address what effect deception has on the characterization of the transaction. Deception should have been considered at a minimum under the Grodt & McKay factor regarding the parties’ treatment of the transaction, but the majority merely notes that the parties’ treatment was inconsistent with a loan because Calloway admitted that he knew he had authorized Derivium to sell his stock. This knowledge, however, is not inconsistent with a nonrecourse loan secured by fungible collateral — such a provision is standard in brokerage and custodian account agreements where stock secures a loan. See supra note 4. The majority fails to mention that Calloway testified that he did not know Derivium had sold the stock and that Derivium sent out quarterly lies that it still held the collateral and credited the amount of dividends paid to reduce Calloway’s interest obligation. That, too, however, was part of the conduct of the parties. The majority similarly notes that Calloway was never required to repay any principal or interest, but this also is consistent with the loan terms — a nonrecourse loan with a balloon payment at the end. We have recognized parties’ rights to structure loans as they see fit, even allowing for zero interest. Welch, 204 F.3d at 1230 (quoting Commissioner v. Valley Morris Plan, 305 F.2d 610, 618 (9th Cir. 1962), revg. 33 T.C. 572 (1959) and Morris Plan Co. v. Commissioner, 33 T.C. 720 (1960)); see also Robinson, supra at 9 (“Nonrecourse loans created by contract can take whatever form meets the needs of the parties”). And we note that even if the taxpayer does not pay interest during the loan term, upon satisfaction of the debt the full amount of the non-recourse debt extinguished becomes part of the gain under Tufts, 461 U.S. at 308-09, Crane, 331 U.S. at 12-13, and section 1.1001-2(a), Income Tax Regs. Accord Allan v. Commissioner, 86 T.C. 655, 666-67 (1986), affd. 856 F.2d 1169 (8th Cir. 1988). Therefore the taxpayer pays taxes on discharged interest, so it remains of economic importance. Finally, the majority notes that the parties did not treat this as a loan because the exact loan amount was not fixed until after Derivium determined the proceeds it would receive from selling the stock. This factor should not impute knowledge to Calloway that Derivium was selling the stock, however, because it was consistent with the terms of the agreement. Schedule A-l, Property Description and Loan Terms, stated that the total loan amount would be “90% of the market value on closing” and closing was to take place “upon receipt of securities and establishment of * * * [Derivium’s] hedging transactions.” This is no different from a home equity line of credit whose precise limit depends on an appraisal and subsequent loan-to-value calculation. VI. A. Even if we didn’t want to accept Calloway’s deal as a loan on its face, we should at least use a more sensible multifactor test here. Taking the factors from Welch and the old BTA cases would yield a different result: Existence of Promissory Note.[7] While there is no promissory note, the “Master Agreement to Provide Financing and Custodial Services” bears the markings of a loan agreement. The recitals in the contract use loan language, specifying: “This Agreement is made * * * to provide or arrange financing(s) and to provide custodial services to * * * [petitioner], with respect to certain properties and assets * * * to be pledged as security.” The services promised in Section 1 include “[providing or arranging financing by way of one or more loans” and “[hjolding cash, securities, or other liquid assets * * * as collateral,” actions indicating initial treatment as a loan. Section 9 binds the parties and their assigns. Schedule A — 1 lists the interest rate, maturity date, and other terms of the loan. This document therefore acts at least formally as a debt instrument. Observing Formalities of Loan.[8] The parties’ continuing course of dealing also supports a finding that they intended to create a loan because they followed through with the loan formalities. Derivium sent Calloway quarterly account statements showing the amount of interest accrued, the loan balance, the maturity date, and the projected balance at maturity. Those statements show that Derivium actually did add interest to the loan balance. The quarterly statements and the end-of-quarter loan balance reflect interest accruing at the agreed rate. Derivium even sent Calloway a notice that the loan term was ending and inquired as to what Calloway intended to do. Calloway responded that he intended to surrender his collateral. Interest Payments or Loan Repayment.[9] It’s certainly true that Derivium’s loans were structured to provide for a balloon payment. But we have seen loans without interim interest payments before. At one time, lenders tried to get away from paying income tax on interest income by giving “original issue discounts” instead of charging interest. Lenders would extend a supposedly interest-free $95 loan, for example, but then require the borrower to repay $100 at the end of the term. See Travelers Ins. Co. v. United States, 25 Cl. Ct. 141, 143 (1992). Congress caught on and enacted section 1281(a), which imputes interest income to holders of original-issue-discount securities, demonstrating that interest can accrue without actual payment during the loan term and without turning the loan into a sale. See also United States v. Midland-Ross Corp., 381 U.S. 54, 57-58, 66 (1965). A loan isn’t even required to bear any interest at all if the parties agree. Welch, 204 F.3d at 1230 (citations omitted). The Commissioner may have a stronger point if the terms of the purported loan called for interest payments and Calloway didn’t pay. But nonpayment of interest according to the terms of the agreement is unpersuasive. Duty to Repay and Reasonable Prospect of Repayment.[10] The Commissioner says Derivium’s transactions weren’t loans because the customers had the right to walk away. But Calloway didn’t have the right to walk away scot free — he had to surrender his collateral. As discussed above, the duty to repay and reasonable prospect of repayment are analyzed differently for a nonrecourse loan. See supra pt. IV.A. Non-recourse loans have satisfied these tests if, at the beginning of the loan, it makes economic sense for the borrower to repay. Tufts, 461 U.S. at 312. Sufficient Funds to Make Loan.[11] Our cases also tell us that if a lender doesn’t have sufficient funds to make the loan at hand, then the transaction is more like a sale. Welch, 204 F.3d at 1230; see also Gouldman, 165 F.2d at 690. But after its scam got going, Derivium had sufficient funds on hand until the whole thing collapsed. The record is clear that Derivium sent Calloway funds before it received the proceeds from the IBM stock, so the loan could not have been funded by the sale. See majority op. p. 31 (“On August 21, 2001, Derivium sent to petitioner a letter informing him that the proceeds of the loan were sent to him * * *. On that same date, a $93,586.23 wire transfer was received and credited to petitioner’s account”); majority op. p. 30 (“On August 22, 2001, the net proceeds from the sale of the IBM stock settled into Derivium’s Morgan Keegan account.”). Ratio of Price Paid to Property Value.[12] Without other evidence, if a lender lends full price for the purported collateral it looks like a sale. United Natl. Corp., 33 B.T.A. at 797. But at what discount should the court infer that the parties intended a loan? In Fisher, the Board of Tax Appeals noted that a purchase for substantially less than fair market value may allow the Court to rescind a sale from an oppressive “lender”, but a small discount coupled with the right to repurchase “does not signify that a loan was intended.” 30 B.T.A. at 441. The discount in that case was not enough to recharacterize the purported sale as a loan. This is admittedly a closer question, but when one of Derivium’s customers didn’t receive full price for his shares and doesn’t ask us to change the formal characterization of the transaction, I think this factor is consistent with intent to take out a loan, or at least insufficient to recharacterize the loan as a sale. Derivium’s Intent and Conduct.[13] We should be mindful that the various tests in the caselaw require us to consider the conduct of both parties. But “intent” is not exactly the right word for what we think we should be looking for when one of the parties to a deal is trying to deceive another. Derivium’s promises of a secret hedging strategy and its continual flow of false statements to its customers, suggest to any reasonable observer in hindsight that its intent was not to make either a loan or a sale, but a quick theft of 10 percent of the stock’s value. But Derivium’s actions in other litigation show a desire to at least publicly represent their transactions as loans. E.g., Derivium Capital LLC v. United States Trustee, 97 AFTR 2d 2006-2582 (S.D.N.Y. 2006) (stating that California court granted summary judgment motion declaring transactions were loans and that Derivium intended to file bankruptcy motion to get determination that transactions were loans, not sales). B. There’s no doubt that the facts of this case are ugly. Calloway relied on a promoter in entering the transaction, testified the transaction was tax motivated, and didn’t report consistently with his own characterization of the transaction by failing to recognize dividends paid on the collateral as income during the loan term and the disposition of the stock as a sale for the amount of the accrued debt at the close of the loan. These facts, while supporting the result in this case, may differ significantly from cases where Derivium’s customers were dupes rather than, at least to some degree, in on the con. Never mind, says the majority, in both classes of case, the initial transfer of stock from a customer’s account to Derivium’s is a sale for tax purposes.[14] But to return to where I began, this case and all the Derivium cases should be easy. If there was a bona fide non-recourse loan, followed by the sale of collateral, the tax rules are clear. According to section 1.1001 — 2(a)(4)(i), Income Tax Regs., “the sale * * * of property that secures a nonrecourse liability discharges the transferor from the liability.” And when a nonrecourse liability is discharged by sale of collateral, the borrower must recognize income at that point — the amount realized is the amount of nonrecourse liability discharged as a result of the sale.[15] Tufts, 461 U.S. at 308-09; Crane, 331 U.S. at 12—13; Fisher v. Commissioner, T.C. Memo. 1986-141 (treating stamp collection as sold by taxpayer in year pawnbroker sold it as opposed to year taxpayer received money from pawnbroker). The first transaction, then, would not be a recognition event for Calloway but Derivium’s sale — even its secret sale — would.[16] In this case, because the two events were nearly simultaneous, the tax consequences to Calloway would be remarkably similar to those flowing from the result reached by the majority.[17] There are, finally, some potentially odd consequences of this opinion. Consider first an easy variation — a simple collateralized loan subject to the same standard contract language as in Derivium’s forms. The stock stays in the lender’s electronic equivalent of a desk drawer, the borrower repays the loan and regains control of the stock. Does this become a sale on the initial transfer? And a repurchase when the loan is repaid? Or consider the example of subordination loans — stocks transferred by an owner to a broker or dealer. The transferor keeps his voting rights and dividends, but gives the transferee the right to sell the transferred stock and retain the proceeds. (This sort of deal is beneficial to the transferor because he gets a stream of payments equal to a percentage of the value of the securities he’s transferred. And it’s beneficial to the broker or dealer because such securities count toward his minimum net-capital requirements.) Courts have always called these loans rather than sales, despite the right of the transferee to sell. See, e.g., Cruttenden v. Commissioner, 644 F.2d 1368, 1374-75 (9th Cir. 1981), affg. 70 T.C. 191 (1978); Lorch v. Commissioner, 605 F.2d 657, 660 (2d Cir. 1979), affg. 70 T.C. 674 (1978). Or, perhaps especially, consider the increasingly complex financial instruments like repos and customized derivatives. All of these alter the “benefits and burdens” of ownership, but some that take on the form of sales are treated as loans. Kleinbard, supra at 798 & n.79 (“For tax purposes, repos traditionally have been treated as secured loans of money.” (citing Rev. Rul. 79-108, 1979-1 C.B. 75, Rev. Rul. 77-59, 1977-1 C.B. 196, and Rev. Rul. 74-27, 1974-1 C.B. 24)); see also Neb. Dept. of Revenue v. Loewenstein, 513 U.S. 123, 130-31 (1994) (finding repos are loans for purposes of 31 U.S.C. section 3124(a)). Must all now be subject to the uncertainty of the Grodt & McKay test? I respectfully concur in the result in this case afed even the imposition of penalties (because Calloway did not respect his own characterization of the transaction as a loan). But unless future courts treat our analysis today as a limited-time ticket good only on Derivium cases, we may be creating more problems than we’re solving. Judge Halpern does recognize this important difference, and (following some quite persuasive commentators) urges us to adopt “control” as the essential attribute of determining the tax ownership of securities. See Halpern op. p. 51. In almost all tax contexts, the concept of control as the touchstone of ownership seems much better than the ever-pliable multifactor tests that dominate the field. I also agree with him that it offers a much better path in explaining the caselaw, at least before today’s result. But it does not adequately distinguish, as I explain below, between secured interests in stock and outright transfers of ownership. Maybe it makes sense to obliterate this distinction, and treat all secured interests in securities as sales if there’s been an effective change in control over them, but that big a change is one for the legislative branch, not us, to make. In the meantime, we should do our best to come up with a way to distinguish secured loans from sales even when modern conditions make the distinction sometimes hard to figure out. The American Law Institute and the National Conference of Commissioners on Uniform State Laws have often had to revisit the problems caused by the rapid changes in the securities industry. Their most recent revision of Article 8 was “to eliminate * * * uncertainties by providing a modern legal structure for current securities holding practices,” U.C.C. art. 8 (1994) (prefatory note), and “to eliminate the uncertainty and confusion that results from attempting to apply common law possession concepts to modern securities holding practices.” Id. sec. 8 — 106 cmt. 7. It would be wise for courts in other areas of law to acknowledge these parallel efforts to accommodate changes in the real world. The DTC is now a subsidiary of the Depository & Trust Clearing Corporation, which sells even more clearinghouse services. The scale of the transactions roiling beneath the placid surface of stable title and possession is mindboggling — annual volume is measured not in trillions, but quadrillions of dollars. The Depository Trust & Clearing Corp., About DTCC, http:// www.dtcc.com/about/business/index.php; Securities and Exchange Commission, Testimony Regarding Reducing Risks and Improving Oversight in the OTC Credit Derivatives Market Before the Subcommittee on Securities, Insurance, and Investment of the Senate Committee on Banking, Housing, and Urban Affairs, James A. Overdahl, Chief Economist (July 9, 2008), available at http://www.sec.gov/news/testimony/2008/ts070908jao.htm. Consider the following language, often found in margin account agreements, where the Borrower gives the Lender the right to “pledge, repledge, hypothecate or re-hypothecate, without notice to me, all securities and other property that you hold, carry or maintain in or for any of my margin or short Accounts * * * without retaining in your possession or under your control for delivery the same amount of similar securities or other property. The value of the securities and other property that you may pledge, repledge, hypothecate or re-hypothecate may be greater than the amount I owe you.” TD Ameritrade, Client Agreement, http://www.tdameritrade.com/ forms/AMTD182.pdf; see also Pershing, Credit Advance Margin Agreement, https:// www.uvest.com/pdfMargin%20Account%20Agreement.pdf; Zecco Trading, Margin Application, https://www.zecco.com/forms/margin-applieation/DownloadForm.aspx. A common instance of this is borrowing against the value of life-insurance policies. The tax treatment of this phenomenon is easy to understand and (one hopes, even after today) settled as a matter of law. Atwood v. Commissioner, T.C. Memo. 1999-61, is a good example. In 1986 and 1988 the Atwoods purchased single-premium life insurance policies. After experiencing some financial difficulty, they decided to borrow against their policies with loans from the insurance company. They received cash immediately and tax free. They had the option to repay the loan plus interest, walk away by surrendering their life insurance policies, or (by paying the premiums) keep the loan outstanding until the policy paid out at their death. The Atwoods didn't pay premiums or loan payments, so the insurer allowed the loan to remain outstanding until 1995, when its balance reached the policy's cash surrender value. At that time the insurance company cashed in the Atwoods’ policy, but instead of sending a check to them, it paid itself back first. Because this payment otherwise would have been a cash distribution to them, the Atwoods were charged with income when the loan was repaid with their policy proceeds. The lack of an enforceable obligation to repay — beyond surrendering pledged collateral — didn’t turn the initial transaction into a sale instead of a loan. Even under the majority’s analysis, giving another party the right to sell is not always a taxable disposition. If the parties’ agreement follows the guidelines in section 1058(b) then the Code says no gain or loss need be recognized by the stock owner at the time of the initial transfer, Sec. 1058(a). This section generally is applied to allow margin brokers to engage in short sales without tax consequences to the stock owners. Section 1058 would mitigate the effect of the majority’s holding if the right to sell was commonly limited to short sales or other transactions that fit into the confines of section 1058(b). But as discussed above, stock owners also customarily give a secured lender the right to sell for the lender’s own protection — e.g., to cover margin calls or repay a loan in default. If a secured lender sells the underlying stock for one of these reasons, then any obligation to return identical securities is typically replaced with an obligation to apply the proceeds of the sale to the outstanding debt. See, e.g., U.C.C. sec. 9-207(c)(2) (2000). This rips the transaction from the protection of section 1058, see sec. 1058(b)(1), and renders the initial transfer taxable under the majority’s analysis. Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000) (existence of debt instrument), affg. T.C. Memo. 1998-121; Fisher v. Commissioner, 30 B.T.A. 433, 440 (1934) (contents of debt instrument). See United Natl. Corp. v. Commissioner, 33 B.T.A. 790, 794 (1935). Welch, 204 F.3d at 1230-31. Id.; United Natl., 33 B.T.A. at 796. Welch, 204 F.3d at 1230. United Natl., 33 B.T.A. at 797; Fisher, 30 B.T.A. at 441. Welch, 204 F.2d at 1230; United Natl., 33 B.T.A. at 794; Fisher, 30 B.T.A. at 440; see also Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). These worries are somewhat alleviated by the majority’s appropriately narrow application of the penalties. In finding for the Commissioner on that issue, the majority relies exclusively on Calloway’s personal treatment of the transaction — including his failure to report consistently with a loan, his reliance on a promoter, and his failure to prove reasonable reliance on other professionals. The timing of the recognition event would be the same if the loan were a recourse loan, but there are some differences in tax treatment when a recourse loan is satisfied by the sale of collateral for less than the debt amount. In that case the stock owner would recognize gain or loss of the sale price less his basis, plus caneellation-of-debt income in the amount of the debt forgiven less the sale price. See Gehl v. Commissioner, 102 T.C. 784, 789-90 (1994), affd. without published opinion 50 F.3d 12 (8th Cir. 1995); sec. 1.1001-2(a), Income Tax Regs.; Rev. Rul. 90-16, 1990-1 C.B. 12. The cancellation-of-debt income would potentially be subject to an insolvency exclusion. See sec. 108(a)(1)(B). The U.C.C. also seems to agree with this outcome. As noted above, while a secured party holds securities, as between the two the debtor is considered the owner of the securities. U.C.C. sec. 9-207 cmt. 6 (Example). But if the secured party sells the underlying securities “by virtue of the debtor’s consent or applicable legal rules” then “the debtor normally would retain no interest in the securit[ies] following the purchase [by a third party] from the secured party.” Id. sec. 9-314 cmt. 3. Because of a small amount of accrued interest, from the time the loan was made until the stock was sold, Calloway would actually have a slightly higher deficiency if we found his transaction to be a bona fide loan. The Commissioner hasn’t made any claim for this little bit of extra deficiency, so he wouldn’t get it. See Baker v. Commissioner, T.C. Memo. 2008-247 (citing Estate of Petschek v. Commissioner, 81 T.C. 260, 271-72 (1983), affd. 738 F.2d 67 (2d Cir. 1984), and Koufman v. Commissioner, 69 T.C. 473, 475-76 (1977)).